Mary E. RAPHAEL, Director,

District of Columbia Public
Library, Appellant,

v.

Adelaide OKYIRI, Appellee.

District of Columbia Public
Library, Appellant,

v.

Adelaide Okyiri, Appellee.

Nos. 96–CV–964, 98–CV–76.

District of Columbia Court of Appeals.

Argued June 24, 1999.
Decided Sept. 16, 1999.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellants.

Michael L. Spekter, Washington, DC for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

On May 9, 1993, appellee Adelaide Okyiri was removed from her position as the

head of the Budget and Fiscal Department of the District of Columbia Public Library (DCPL). Dr. Hardy Franklin, then the DCPL's Director, ordered Ms. Okyiri's removal after having found, following the institution of an adverse action, that Ms. Okyiri had engaged in insubordination and inexcusable neglect of duty.

Ms. Okyiri challenged her termination in an administrative proceeding before the Office of Employee Appeals (OEA). On June 19, 1995, following an evidentiary hearing that lasted four days, an Administrative Law Judge (ALJ) of the OEA issued a written decision in Ms. Okyiri's favor and ordered that Ms. Okyiri be restored to her position with back pay. The ALJ's decision was affirmed by the OEA, and the OEA's decision was in turn affirmed by Judge Russell F. Canan of the Superior Court.

Ms. Okyiri also brought a civil action against Dr. Franklin pursuant to the District of Columbia whistleblower statute then in effect, D.C.Code § 1–616.3 (1992).[1] On June 13, 1996, following a lengthy trial, Judge Linda Turner Hamilton issued a written order in which she sustained Ms. Okyiri's allegations and granted relief similar to that awarded in the administrative proceeding. The judge also held that Ms. Okyiri was entitled to recover reasonable counsel fees.

The DCPL[2] has appealed from the orders of Judge Canan and Judge Hamilton, and the appeals have been consolidated by order of this court. The DCPL contends that the evidence in both cases sustained the allegations of insubordination and inexcusable neglect on Ms. Okyiri's part, that the DCPL acted in accordance with its managerial prerogatives in discharging Ms. Okyiri, and that both courts and the OEA committed legal error in holding to

the contrary. The DCPL also claims that Judge Hamilton's factual findings in the whistleblower case are not supported by the evidence and that the judge applied an erroneous legal standard in relation to the burden of proof.

With respect to each of the decisions on appeal, for the reasons stated below, we conclude that there was ample evidence to support the findings of the trier of fact. In each case, however, these findings may have been induced by a legally erroneous assessment of the evidence of inexcusable neglect of duty. Accordingly, we vacate each judgment and remand for further proceedings.

### I.

### THE OEA APPEAL

A. *The evidence.*

(1) *General background.*

Ms. Okyiri became the head of the DCPL's Budget and Fiscal Department, a DS–14 position, in December 1991. She came to the job with excellent qualifications. A career civil servant, Ms. Okyiri held a master's degree in finance and investments. She was also a licensed CPA, and she had ten years of experience as a financial officer for various District of Columbia agencies. The ALJ found that "[t]he employee's record of work for the District was spotless until she came to the library."

Upon assuming her duties and examining the DCPL's books of account, Ms. Okyiri concluded that the agency did not have adequate financial controls to prevent theft, and she suspected that money had in fact been stolen. Ms. Okyiri also discovered that the DCPL had commingled funds in various accounts and that contractors

---

1. The protections granted by § 1–616.3 were expanded by the District of Columbia Whistleblower Reinforcement Act (DCWRA), D.C.Code § 1–616.11 (1999). The DCWRA is not retroactive, and it does not apply to the present case. *See* § 1–616.19.

2. The nominal appellant in the whistleblower action is Mary E. Raphael, who succeeded Dr. Franklin as Director of the DCPL. For convenience, we refer to both appellants as the DCPL.

had sometimes been paid under expired contracts or pursuant to informal agreements. Ms. Okyiri further observed that some contractors had been chosen on a non-competitive basis and appeared to be on personally friendly terms with Dr. Franklin or with other DCPL officials. The OEA found that "[i]n order to eliminate these problems, [Ms. Okyiri] was determined to implement sound financial practices."

Ms. Okyiri's efforts in this regard, apparently coupled with what some DCPL employees regarded as a somewhat unbending and perhaps prickly personality, brought her into conflict with a number of her supervisors and colleagues. Dr. Franklin testified that Ms. Okyiri had little regard for her co-workers, superiors or established procedures. It was in the resulting less than cordial atmosphere that the allegations against Ms. Okyiri of insubordination and dereliction of duty arose.

### (2) The Greenlee voucher.

Marcia Greenlee, Ph.D., was an independent contractor for the DCPL who specialized in historic preservation and black history. Ms. Okyiri discovered that, over the past several years, Dr. Greenlee had received several sizable consulting contracts from the DCPL on a non-competitive basis. The last of these contracts, which had been agreed to in June 1991, provided that Dr. Greenlee would receive compensation at the rate of $300 per day, and total remuneration not to exceed $21,000, as a consultant on oral history.

Ms. Okyiri also noticed that, unlike other contractors, Dr. Greenlee had an office in the main library, worked regular government hours, used DCPL supplies, attended executive meetings, and frequently had lunch with Dr. Franklin and with Dr. Franklin's then executive assistant (and now successor), appellant Mary E. Raphael. Moreover, Dr. Franklin had requested Dr. Greenlee to coordinate the Martin Lu-

ther King gala, an event which was funded by the Library Foundation, a private local organization, and Ms. Okyiri was concerned that DCPL funds might have been used for the gala. All of these circumstances made Ms. Okyiri "increasingly suspicious" of the relationship between DCPL and Dr. Greenlee and about the possibility that the DCPL was being charged for work Dr. Greenlee was doing for the ALA on the gala.

On December 8, 1992, Dr. Greenlee submitted an invoice requesting that the DCPL pay her $3600 for services rendered on her consulting contract. Dr. Greenlee included with her invoice a statement detailing the services that she had performed during the billing period, but no supporting documentation. Ms. Raphael, the contract administrator, approved the invoice and forwarded a voucher to Ms. Okyiri to sign as certification officer. Ms. Okyiri had previously approved invoices submitted by Dr. Greenlee. On this occasion, however, she declined to sign the voucher because "I knew it was a duplicate bill. I felt it. I could tell. I could smell it." A member of Ms. Okyiri's staff, acting at Ms. Okyiri's direction, telephoned Dr. Greenlee and advised her that payment would be delayed until Ms. Okyiri could inspect the work product reflected in the billing.

Dr. Greenlee responded to this telephone call by notifying Ms. Raphael that "I have made no response to Ms. Okyiri, nor do I intend to." Instead, Dr. Greenlee asked Ms. Raphael to handle the matter. Ms. Okyiri and Ms. Raphael were not on speaking terms at the time, and the problem was brought to Dr. Franklin's attention. Dr. Franklin met with Ms. Okyiri and orally ordered her to approve Dr. Greenlee's voucher. Indeed, according to a memorandum written by Ms. Okyiri which was credited by the ALJ, Dr. Franklin instructed her that so long as Ms. Raphael, the contracting officer,[3] was sat-

---

**3.** Ms. Okyiri was of the opinion that someone other than Ms. Raphael should have moni-

tored the contract, because "[t]here is a conflict of interest when you have the same per-

isfied with the invoice, "no supporting documentation is necessary and no questions should be asked."

Ms. Okyiri persisted in her refusal to sign the voucher. In a memorandum dated February 17, 1993, she directed Dr. Franklin's attention to Mayor's Memorandum 83–68, which provides that before approving a payment, certification officers shall, *inter alia:*

> Confirm that the payment is permitted by law and is in accordance with the terms of the applicable agreement; ...
> Ascertain that the payment to be made is not a duplication; ... and
> Ascertain that the proper forms of documentation (invoices, bills, statements of account) were used to support the payment. ...

The memorandum further states that certification officers will:

> (1) Be held responsible for the existence and correctness of the facts recorded in the certificate or otherwise stated in the voucher or its supporting papers, including the correctness of computations on such voucher, and for the legality of the proposed payment under the appropriation or fund involved[; and]
> (2) Be held responsible for and required to make good to the United States or to the District of Columbia the amount of any illegal, improper, or incorrect payment resulting from any false, erroneous, or misleading certification made by him as well as for any payment prohibited by law or which did not represent a legal obligation under the appropriation or fund involved.[4]

Ms. Okyiri offered to approve Dr. Greenlee's voucher if Dr. Franklin advised her in writing that the Mayor's Memorandum should be ignored. Dr. Franklin responded five days later with a memorandum in which he did not address the Mayor's directive but reiterated his insistence that Ms. Okyiri sign the voucher if Ms. Raphael told her that it was acceptable. Ms. Okyiri was ordered to approve the voucher no later than February 26, 1993.

On March 16, 1993, the DCPL's legal counsel issued an opinion in which he concluded that the voucher had been sufficiently documented and that the agency was therefore obliged to pay Dr. Greenlee's invoices. This opinion, however, was never brought to Ms. Okyiri's attention. Two weeks later, in a letter to Ms. Raphael, Dr. Greenlee stated that payment for her services was long overdue, and that if the matter was not resolved promptly, Dr. Greenlee would be compelled to "explore other means of redress at my disposal." Ms. Okyiri nevertheless persisted in refusing to certify the invoice for payment. This refusal was the basis for the subsequent charge of insubordination in the adverse action instituted against her.

### (3) *The dispute over Form PL 456.*

On February 26, 1993, only four days after ordering Ms. Okyiri to approve Dr. Greenlee's voucher, Dr. Franklin issued a "letter of warning" to her in connection with a separate alleged act of insubordination. The ALJ, the OEA, and the trial judge all ultimately sustained Ms. Okyiri's grievance against this letter of warning, and the DCPL does not contest these rulings in the present appeal. The dispute is nevertheless relevant in that it sheds some light on the credibility of the various actors and on Dr. Franklin's motivation.

The subject of this controversy might be considered almost trivial. The DCPL was about to revise its financial control form, styled PL 456, which was used by employees who needed to purchase goods or ser-

---

son initiate a contract and also monitor a contract. That is when you normally have potential for fraud."

**4.** Memorandum 83–68 is based on D.C.Code § 47–120 (1997), which imposes obligations

on the District's Auditor, and on any employee in the Auditor's office, similar to those applied to certification officers by Memorandum 83–68.

vices for the DCPL. Dr. Franklin did not like the proposed revision. He claimed that he had directed Ms. Okyiri not to discuss the revised form and not to permit discussion of it at a forthcoming librarians' meeting. Dr. Franklin alleged in his letter of warning, and he subsequently testified before the ALJ, that Ms. Okyiri had allowed one of her subordinates to discuss implementation of the unauthorized revision of the PL 456 form, despite his instructions not to do so. He viewed her conduct as a "disregard for my directive [and] as a clear act of insubordination."

Ms. Okyiri denied that Dr. Franklin had told her not to discuss the revised form, and she and other witnesses testified that, in any event, the matter had not been discussed at the librarians' meeting. As the OEA pithily put it, Ms. Okyiri "accused Franklin of concocting the whole incident as a means of retaliating against her for her refusal to certify the Greenlee invoice." The ALJ, as the trier of fact, did not credit Dr. Franklin's testimony, and he absolved Ms. Okyiri of any culpability in this matter.

### (4) *The Bert Smith & Company letter.*

In September 1992, Ms. Okyiri received a copy of a draft audit by the independent accounting firm of Bert Smith & Company in which it was indicated that in 1990 the DCPL may have overspent its federal funds by $75,000. By letter dated October 22, 1992, the District of Columbia Controller's office directed the DCPL to provide an explanation. Lawrence E. Molumby, the Deputy Director of the DCPL and Ms. Okyiri's immediate supervisor, requested Ms. Okyiri to provide him with relevant documents relating to the alleged overspending. Ms. Okyiri, who had not been with the DCPL in 1990, was apparently unable to do so. Ms. Okyiri suggested that the DCPL request the Controller's office to obtain additional information from Bert Smith & Company. Mr. Molumby agreed, and on November 5, 1992, a letter was sent to the Controller under Dr. Franklin's signature requesting that additional information be obtained from the accounting firm.

On December 22, 1992, Bert Smith & Company mailed the requested information directly to Ms. Okyiri. Unfortunately, however, Ms. Okyiri "didn't pay much attention to [the envelope from Bert Smith & Company] when it arrived and left it sitting in her in-box." [5] Notwithstanding the potential importance of the information which the DCPL had been seeking—if there had been overspending, as alleged, then the DCPL could have been required to reimburse the federal government—Ms. Okyiri completely ignored the accounting company's letter for more than two months. Ms. Okyiri was not alone in her passivity; neither Dr. Franklin nor Mr. Molumby made any inquiry about the subject during this period. [6]

On March 3, 1993, the Controller notified Dr. Franklin that Bert Smith & Company had provided the requested information to the DCPL on December 22, and that the DCPL had failed to provide any explanation of the alleged overspending. The Controller's letter was severe in tone and, in Mr. Molumby's words, "threaten[ed] some kind of extreme measure if we didn't get this cleared up." Mr. Molumby immediately asked Ms. Okyiri whether she was aware of any communication from Bert Smith & Company. Ms. Okyiri looked in her in-box and observed a large envelope. Remarking that "this must be it," she then handed Mr. Molumby the unopened package. Ms. Okyiri testified

---

**5.** The quoted sentence is from the OEA's opinion.

**6.** Mr. Molumby acknowledged that, in spite of the urgency of the matter, he never followed up on the December request for documents until March 3, 1993. In the whistleblower case, Mr. Molumby justified his own failure to make any inquiry regarding a matter that he claimed to have considered so important by stating that "I was not in the habit of badgering and pestering people under me."

that the first time she was aware of the envelope was when Mr. Molumby inquired about the matter, and that "if I had seen it before it didn't register."[7] As it turned out, the letter from the accountants further revealed that the initial report was in error and that there had been no overspending in 1990. The DCPL therefore was not penalized or harmed as a result of the inaction of Ms. Okyiri and of her superiors.

Ms. Okyiri's explanation for leaving the unopened communication in her in-box from December through March was that she had been busy preparing the budget and, as she told Mr. Molumby, that "people make mistakes." She also claimed that the original of the document would ordinarily have been sent to Dr. Franklin, who had made the request to the Controller, and that she believed that the envelope sent to her contained only a courtesy copy.[8]

### (5) The proceedings against Ms. Okyiri.

On February 26, 1993, four days before the discovery of the Bert Smith & Company letter in Ms. Okyiri's in-box, Dr. Franklin issued the formal "letter of warning" accusing Ms. Okyiri of insubordination in relation to the Form PL 456 controversy.

On April 8, 1993, Mr. Molumby sent Ms. Okyiri a thirty-day notice proposing that she be removed for insubordination in connection with Dr. Greenlee's voucher and for inexcusable neglect of duty in connection with the Bert Smith & Company letter. The portion of the notice dealing with the neglect of duty allegation included the following:

> Lorenzo McQueen, the designated contact person in the DC Controller's Of-

fice[,] indicated that he had spoken with you several times in January and February asking what the Library was going to do about the audit. According to McQueen you urged him to have the Controller write the March 2 letter to Dr. Franklin. It is incomprehensible to me that you never let me or Dr. Franklin know of either of these inquiries from the Controller's Office or of the crucial information in your possession during January and February.

> Your failure to bring to the attention of me or the Director the information you had received in late December, information that you knew was critically important to our response to the audit, constitutes a serious neglect of your duty. As Head of the Budget and Fiscal Department, it is your responsibility to assist the Library in issues relating to audits, especially when costs are questioned. Your action could have resulted in a negative audit report, needless embarrassment to the Library, and even the need to reimburse the federal government $75,000 for funds which the Library had in fact spent in compliance with federal requirements.

### B. The decisions of the ALJ, the OEA, and the trial court.

The dispute between Ms. Okyiri and the DCPL has come before an impressive number of tribunals. This court is the sixth entity or individual to consider Mr. Molumby's allegations against Ms. Okyiri[9] and the second to consider the whistleblower case.

After the initiation of the adverse action, the DCPL's personnel director designated Jewell Ogonji as a "disinterested designee"

---

**7.** At the trial of the whistleblower case, Ms. Okyiri acknowledged that "I didn't even know what was in my box and what wasn't in my box."

**8.** This claim, heavily relied upon by the ALJ and the OEA, appears to be somewhat beside the point in light of Ms. Okyiri's admission that she did not know what was in her in-box,

and that if she had previously seen the envelope, that fact had not "register[ed]."

**9.** Specifically, these allegations have been brought before (1) a disinterested designee, see text preceding note 10, *infra*; (2) Dr. Franklin; (3) the ALJ; (4) the OEA; (5) the Superior Court; and now (6) this court.

who was to hold a hearing on the proposed discipline.[10] Ms. Okyiri made no objection to Ms. Ogonji's designation. On May 5, 1993, Ms. Ogonji recommended that Mr. Molumby's proposal to remove Ms. Okyiri be sustained. Dr. Franklin approved the proposal four days later.

### (1) *The ALJ's decision.*

Ms. Okyiri contested the adverse action, and the case was eventually assigned to the ALJ, Christopher A. Sterbenz. On June 19, 1995, in a thirteen-page order, the ALJ sustained Ms. Okyiri's position on all issues.

Turning first to the controversy over Form PL 456, the ALJ found that the allegedly insubordinate conversation in which Ms. Okyiri was accused of participating never took place. The ALJ believed the testimony of Ms. Okyiri and of two disinterested witnesses who supported Ms. Okyiri's position on this issue, and he found that "Dr. Franklin's testimony on this point was far less credible." The ALJ thus effectively found that, at the very time that the dispute over the Greenlee voucher was at its peak, Dr. Franklin had made a false accusation against Ms. Okyiri and had used that false charge to discipline her.

Turning to the insubordination charge that formed one of the bases for the adverse action, the ALJ found that "[t]he voucher in question was not adequately supported by documentation showing that Ms. Greenlee had performed the work required by her contract." [11] He wrote that

the agency director ordered the employee to certify an invoice for payment when the employee believed that the documentation supporting the invoice was insufficient. In effect, the agency director demanded that the Greenlee voucher be paid "with no questions asked." This was an illegal order, and the employee was not required to comply with it.

\* \* \* \*

[T]he employee was subjected to harassment and termination because she refused to ignore legal restrictions on the undocumented dis[bur]sement of taxpayers' money. Rather than telling the employee to certify vouchers with "no questions asked," the agency should have welcomed the vigorous conscientious way in which the employee guarded the public purse.

The ALJ commented that Ms. Okyiri was left with a Hobson's choice between either certifying the voucher for payment (and thereby risking personal liability pursuant to the Mayor's Memorandum) or declining to certify it and placing herself in danger of dismissal for insubordination. The second of these risks became a reality.[12]

Finally, the ALJ rejected as pretextual and false the charge of inexcusable neglect of duty:

There is a critical element missing here, and that is the employee's *actual duty* to provide the letter from Bert Smith & Company to her superiors. The record in this case does not firmly establish that the employee had a duty to turn

---

**10.** A "disinterested designee" must hold a grade no lower than DS–13, and may not be in the chain of command or directly subordinate to the deciding official.

**11.** The ALJ acknowledged that, in the opinion of the DCPL's counsel, the voucher was sufficiently documented. Nevertheless, after reviewing the documentation, the ALJ "f[ou]nd as fact that the employee reasonably and correctly believed that the documentation accompanying the Greenlee voucher was insufficient." The ALJ also considered, but largely rejected as "unusually evasive," the testimony

of Ms. Raphael in defense of Dr. Greenlee's voucher.

**12.** The ALJ also noted the testimony of Ms. Okyiri's successor, Ronald J. Otey, Jr., that Mr. Otey had resigned after only six months in the job because "Dr. Franklin requested that [Otey] certify vouchers for payment when the vouchers 'weren't related to library business'" and because senior officials of the library interfered with Mr. Otey's exercise of his duties as controller.

over the letter to her superiors, and any speculation that she should have done so without being told is irrelevant. The employee testified that she believed that the information was a duplicate of information previously provided to Dr. Franklin. This is wholly reasonable, since the employee had not made the inquiry for this information in the first place. It is apparent to me that this charge is a pretext manufactured by the agency in order to support its managers' decision to get rid of an employee that they felt to be an obstructionist.

(Emphasis in original) (footnote omitted).

### (2) *The OEA decision.*

The DCPL sought review of the ALJ's decision invalidating the removal of Ms. Okyiri from her position, and on December 23, 1996, the OEA affirmed the ALJ's ruling. Unlike the ALJ, the OEA devoted considerable attention to the DCPL's criticisms of Ms. Okyiri as uncooperative and difficult to deal with. Nevertheless, the OEA sustained the ALJ's order.

With respect to the Greenlee voucher, the OEA concluded that both sides had acted somewhat unreasonably:

In this case, neither Agency nor Employee sought an opinion from the Controller concerning certification of the Greenlee voucher.[13] Instead, both parties backed into their respective corners unwilling or unable to recognize any merit in the other's position. As a result, Agency focused entirely on its contractual obligations with Greenlee and ignored Employee's concern that she could be held personally liable under Mayor's Memorandum 83–68 for an erroneous certification. Employee, on the other hand, focused entirely on her potential liability under Mayor's Memorandum 83–68 and ignored Agency's concern that a failure to pay Greenlee could constitute a breach of contract.

The OEA expressed some puzzlement as to what "work product" Dr. Greenlee could have produced to satisfy Ms. Okyiri that Dr. Greenlee had performed the work she claimed to have performed, when that contract was for consulting services, and when "[m]uch of the work for which Greenlee billed was not in the form of a reviewable work product." The OEA also questioned whether Ms. Okyiri would have been satisfied with whatever documentation was available. Nevertheless, the OEA concluded:

Although documentation of the services was not required under the contract, it is an express requirement under Mayor's Memorandum 83–68. Thus, Agency could not order Employee to certify an inadequately documented voucher without requiring her to violate the Mayor's Order and subject herself to personal liability for an improper certification. We agree with the A.J. that Agency's order was both unreasonable and unlawful.

Turning to the allegation of inexcusable neglect of duty, the OEA quoted from, but did not expressly adopt or reject, the ALJ's finding that this charge was a "pretext manufactured by the agency." But although the OEA was obviously more troubled than the ALJ had been by Ms. Okyiri's protracted inaction following her receipt of the letter from Bert Smith & Company, it nevertheless affirmed the ALJ's disposition:

There is no question that Employee was Agency's highest ranking financial official and that her position was equivalent to an agency controller. Employee knew that her superiors were anxious to resolve the questioned costs for FY 1990 and she herself was the one who suggested that her superiors request the additional information from Bert Smith. Normally, Employee would have an implicit duty to turn the information over

---

**13.** The Mayor's Memorandum states that "questions concerning the certification process ... should be directed to the Office of the Controller."

to her superiors as soon as she received it.

However, according to Employee, Agency routinely routed financial correspondence to Franklin. Therefore, even if Employee had seen the correspondence, she could reasonably assume that Franklin had already received a copy of it. Other than speculation, Agency offered nothing to rebut Employee's sworn testimony and we do not find her testimony inherently incredible.

In our view, Employee cannot be disciplined for failing to deliver a copy of the Bert Smith document to Franklin when she had a reasonable basis for believing that he had already received it through Agency's internal routing procedures. Under the circumstances, Agency's decision to remove Employee was unwarranted and the initial decision must be affirmed.[14]

### (3) *The trial judge's decision.*

The DCPL sought review of the OEA decision in the Superior Court. On January 14, 1998, in an eleven-page written order, the court concluded that all of the OEA's findings were supported by substantial evidence, and that, contrary to the DCPL's claims, the OEA's legal conclusions flowed rationally from its findings. The judge held that "the Library could not legally order Ms. Okyiri to certify payment of the submitted undocumented voucher without requiring her to violate the Mayor's Memorandum which would make her personally liable." He therefore concluded that "[i]t was not arbitrary or capricious [for the OEA] to determine that the Library's order was both unreasonable and unlawful." With respect to the inexcusable neglect of duty charge, the judge wrote:

The A.J. ruled that the employee had no affirmative duty to turn over the information, reasonably thought the superior

already had a copy of it, and that the charge of inexcusable neglect was simply a pretext manufactured by the Library as a means to fire Ms. Okyiri. As the OEA Opinion and Order noted, Ms. Okyiri gave sworn testimony to this effect and was found by the A.J. to be credible. The Library offered nothing to rebut the sworn testimony of Ms. Okyiri. There is no evidence presented to warrant a finding that Ms. Okyiri's testimony was not credible. With no contrary evidence provid[ing] that Ms. Okyiri had an affirmative duty to forward the information and substantial evidence pointing to the conclusion that Ms. Okyiri simply thought her supervisors had already received a copy as was normal procedure, there is no basis to question the OEA's decision that the Library's decision to remove Ms. Okyiri was unwarranted.

### C. *Legal Discussion.*

### (1) *Applicable standards of review.*

This case's tortuous procedural journey from its initiation by Mr. Molumby to the present appeal requires us to consider not one standard of review but several. The merits of Molumby's allegations were addressed at two levels within the DCPL (the "disinterested designee" and the Director) and two levels at the OEA (the ALJ and the OEA itself), and the issue is now before the second judicial body to consider it.

Dr. Franklin followed the disinterested designee's recommendation, and no issue is presented as to whether he owed Ms. Ogonji's determination any deference. The scope of the OEA's review of Dr. Franklin's decision, however, is limited. In *Stokes v. District of Columbia,* 502 A.2d 1006 (D.C.1985), we found it to be "self-evident" from the language and legislative history of the Merit Personnel Act that

14. The OEA also rejected the DCPL's challenge to the ALJ's disposition of the letter of warning, noting that it was bound by the

ALJ's credibility findings because the ALJ had had an opportunity to observe the demeanor of the witnesses.

the OEA is not to substitute its judgment for that of the agency and that its role, like that of its federal counterpart, the Merit Systems Protection Board, is simply to ensure that "managerial discretion has been legitimately invoked and properly exercised." *Douglas v. Veterans Administration*, 5 MSPB 313, 328, 5 M.S.P.R. 280, 301 (1981) (footnote omitted). Indeed, the OEA's own regulations state that it will uphold an agency decision unless (1) it is unsupported by substantial evidence, (2) there was harmful procedural error, or (3) it was not in accordance with law or applicable regulations. OEA Proposed Regulations §§ 614.2, 614.5, 27 D.C.Reg. 4361–4362, *adopted as final*, 27 D.C.Reg. 5449 (1980).

*Id.* at 1010.

■ Turning now to the substance of the OEA's review, it is significant that of the various tribunals that have considered this case, only the ALJ heard the testimony and observed the demeanor of the witnesses. Due deference must therefore be accorded to the ALJ's credibility determinations, both by the OEA, *see, e.g., Kennedy v. District of Columbia*, 654 A.2d 847, 854 (D.C.1994); *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 683 A.2d 470, 477 (D.C.1996), and by a reviewing court. *Kennedy, supra*, 654 A.2d at 856; *see also Metropolitan Police Dep't v. Baker*, 564 A.2d 1155, 1159 (D.C.1989). To be sure, "it is the [OEA's] final decision, not the [ALJ's], that may be reviewed in this court." *St. Clair v. District of Columbia Dep't of Employment Servs.*, 658 A.2d 1040, 1044 (D.C.1995) (per curiam); *Washington Metro. Transit Auth., supra*, 683 A.2d at 472. Nevertheless, the ALJ's findings of fact are binding at all subsequent levels of review unless they are unsupported by substantial evidence, and this is true even if the record also contains substantial

evidence to the contrary. *Baker, supra*, 564 A.2d at 1159 (citation omitted).

■ "In reviewing an agency decision, the Superior Court 'shall base its decision exclusively upon the administrative record and shall not set aside the action of the agency if supported by substantial evidence in the record as a whole and not clearly erroneous as a matter of law.' " *Id.* (quoting Super. Ct. Civ. R., Agency Review 1(g) (1988)). When an appeal is taken from a decision of the Superior Court reviewing a decision of the OEA, we owe no deference to the ruling of the trial judge, and the scope of our review of the OEA's decision "is precisely the same as that which we employ in cases that come directly to this court." *Id.* (quoting *Stokes, supra*, 502 A.2d at 1010). In conducting that review, we must determine not only whether the OEA's findings are based on substantial evidence on the record as a whole, but also whether the OEA's legal conclusions flow rationally from its findings. *See, e.g., District of Columbia Gen. Hosp. v. District of Columbia Office of Employee Appeals*, 548 A.2d 70, 77 (D.C.1988).

■ In an adverse action proceeding to remove an employee for misconduct, the agency must present evidence showing

(1) that the employee actually committed the alleged misconduct; (2) that there is a sufficient nexus between the misconduct and the efficiency of the service to sustain an adverse action; and (3) that the penalty imposed has been appropriately chosen for the specific misconduct involved.

*Parsons v. United States Dep't of Air Force*, 228 U.S.App.D.C. 1, 4, 707 F.2d 1406, 1409 (1983) (per curiam).[15] The burden of persuasion regarding these three elements is on the agency. *Id.; see also* the OEA regulations, 39 D.C.Reg. 7424 (1992); *Weinberg v. Macy*, 124 U.S.App.

---

15. The interpretation by a federal appellate court of a related federal statute can be helpful in identifying the employer's burden in an adverse action before the OEA. *See District of Columbia Metropolitan Police Dep't v. Broadus*, 560 A.2d 501, 507 (D.C.1989).

D.C. 1, 4, 360 F.2d 816, 819 (1965); *Reinke v. Personnel Bd. of Wis.*, 53 Wis.2d 123, 191 N.W.2d 833, 837 (1971); 67 C.J.S. *Officers* § 156, at 559–61 (1978 & Supp.1999). An employee who claims that she was discharged in reprisal for engaging in protected activities, however, must carry the burden of persuasion on that issue. *See Frazier v. Merit Sys. Protection Bd.*, 217 U.S.App.D.C. 297, 312, 672 F.2d 150, 165 (1982).

### (2) *Insubordination.*

■ Under the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–601.1 *et seq.* (1999), the DCPL had the authority to discharge Ms. Okyiri for cause. Insubordination, defined as "failure or refusal to comply with written instructions or direct orders by a superior," 16 DPM[16] § 1618.1, 34 D.C.Reg. 1865 (1987), constitutes cause, for "[t]here can be no doubt that an employee may be discharged for failure to obey valid instructions, or that a discharge for insubordination will promote the efficiency of the service." *Meehan v. Macy*, 129 U.S.App. D.C. 217, 231, 392 F.2d 822, 836 (1968); *see also* 16 DPM § 1603.1(e), 34 D.C.Reg. 1850. Removal is a permitted sanction for insubordination even if the offense is the employee's first. 16 DPM § 1618.1, 34 D.C.Reg. 1865.

■ Ms. Okyiri does not deny that she refused to comply with Dr. Franklin's order to certify Dr. Greenlee's voucher. But "[i]nsubordination can be rightfully predicated only upon a refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed." *Stephens v. Department of State Police*, 271 Or. 390, 532 P.2d 788, 790 (1975) (en banc) (quoting *Garvin v. Chambers*, 195 Cal. 212, 232 P. 696, 701 (1925)); *Redfearn v. De-*

*partment of Labor*, 58 M.S.P.R. 307 (1993).[17] Ms. Okyiri contends, and the OEA found, that Dr. Franklin's order was unlawful and unreasonable in light of Ms. Okyiri's responsibilities under the Mayor's Memorandum, and that Ms. Okyiri therefore was not obliged to obey it. Although the issue is not an easy one, we conclude that reversal of the OEA's disposition of the insubordination charge is not warranted.

Evidence credited by the ALJ and outlined in Part I A(2) of this opinion established that, notwithstanding her rather subjective phrasing—she testified that she could "smell" a duplicate payment—Ms. Okyiri had a reasonable basis for concern regarding Dr. Greenlee's voucher. She had detected financial irregularities in some of the DCPL's activities. Dr. Greenlee was being paid substantial amounts of money on successive consulting contracts. She was working on the Martin Luther King gala for the Library Foundation, and had her own office at the library. Dr. Greenlee appeared to be very friendly with Dr. Franklin and Ms. Raphael, and perhaps a part of their favored coterie. When asked to substantiate the work that she had done, Dr. Greenlee declined to cooperate with Ms. Okyiri's office, and insisted on dealing instead with the contracting officer, who was her friend, Ms. Raphael. When Dr. Franklin became involved in the controversy, he ordered Ms. Okyiri to sign the voucher if Ms. Raphael had approved it, regardless of any lack of documentation, and with no questions asked.[18] The OEA could reasonably conclude that this sequence of events put Ms. Okyiri in a very difficult position in light of the Mayor's Memorandum, and that it was unreasonable for the DCPL to require Ms. Okyiri to approve the invoice or face dismissal.

---

**16.** DPM stands for the District of Columbia Personnel Manual.

**17.** M.S.P.R. stands for the federal Merit Systems Protection Reporter.

**18.** The ALJ observed, not unreasonably, that

[t]he library system has an operating budget in excess of 20 million dollars a year. It strikes me as very peculiar that the agency director would become so intimately involved in the certification and payment of a voucher worth $3,600.00.

The OEA obviously recognized that Ms. Okyiri's handling of the situation was less than ideal. She could have requested the assistance of the Controller's office, but did not do so.[19] Ms. Okyiri is not an attorney, and we cannot recognize any general principle that an employee's subjective feeling that an order from her superior is unlawful or unreasonable permits her to disobey it with impunity. In this case, however, the OEA could reasonably conclude that Ms. Okyiri's refusal rested not solely on her untrained legal analysis, but also on the initial suspicious circumstances, on Dr. Greenlee's unresponsiveness, and on Dr. Franklin's "no questions asked" approach. Given what the ALJ found to be Ms. Okyiri's legitimate concerns and conscientious scruples, the apparent confirmation of these concerns in the text of the Mayor's Memorandum, and the ready availability of other certification officers,[20] the OEA could properly conclude that the order which Ms. Okyiri refused to obey was unreasonable. Even if the Mayor's Memorandum did not forbid Ms. Okyiri from certifying the voucher without additional documentation, the OEA concluded that it exposed her to "a confusing dual line of authority" that potentially made her liable personally to the Controller for a payment ordered by the agency director. In such circumstances where the validity of Dr. Franklin's order was reasonably in question, the OEA properly concluded that Ms. Okyiri had not been insubordinate in the Greenlee matter.

As the OEA noted, Ms. Okyiri was not charged, as she arguably might have been, with disobeying a superior's command to gather all relevant information that was needed in order to determine whether the invoice should be approved. If that had been the charge, and if the DCPL proved that Ms. Okyiri had disobeyed such an order, we would have no hesitation in concluding that her disobedience constituted insubordination. Given the actual allegation against Ms. Okyiri, however, the OEA's disposition was not unreasonable. *See Office of D.C. Controller v. Frost,* 638 A.2d 657, 663 (D.C.1994) (evidence must be sufficient to support "allegations actually made").[21]

### (3) *Inexcusable neglect of duty.*

Like insubordination, "inexcusable neglect of duty" constitutes grounds for removal, even for a first offense. 16 DPM

---

19. Significantly, however, Dr. Franklin and Mr. Molumby likewise failed to seek the Controller's advice.

20. The DCPL had three other such officers who could have been asked to consider Dr. Greenlee's invoice. Indeed, one of these officers subsequently approved her voucher. The danger that Dr. Greenlee could bring a meritorious action for breach of contract against the DCPL could readily have been avoided by an earlier reassignment of the voucher to one of the other individuals with certifying authority. If that individual had also balked, then there would have been even more reason for the DCPL to examine the voucher further.

21. According to the DCPL, the opinion of counsel that the voucher could properly have been approved removes the basis for Ms. Okyiri's refusal to sign it. We conclude that this position is not well taken. First, the DCPL inexplicably failed to bring counsel's opinion to Ms. Okyiri's attention. Second, the ALJ, having carefully examined the materials submitted by Dr. Greenlee, found counsel's opinion unpersuasive.

We are likewise unpersuaded by the DCPL's apparent position that the Mayor's Memorandum does not have the force of law and that Ms. Okyiri was therefore obliged to ignore it. Ronald Gaskins, a representative of the Controller's office, testified that a certifying officer may be held personally liable for a payment made to a contractor where the specified work has not been done. Mr. Gaskins recalled that one certifying officer had "just had his authority revoked for not following the guidelines in the Mayor's memo." The OEA could reasonably conclude, under these circumstances, that adherence to the procedures set forth in Memorandum 83–68 did not warrant an employee's discharge for insubordination when she had been ordered to approve a voucher "with no questions asked."

§ 1603.1(d), 34 D.C.Reg. 1850 (1987).[22] Mr. Molumby alleged that Ms. Okyiri's handling of the Bert Smith & Company letter constituted inexcusable neglect of her responsibilities. The ALJ, the OEA, and the trial judge all concluded that the DCPL failed to prove inexcusable neglect on Ms. Okyiri's part. The DCPL contends that this conclusion is flawed by legal error as to the significance of Ms. Okyiri's conduct. In substantial measure, we agree.

### (a) The underlying conduct.

The evidence shows, beyond dispute, that Ms. Okyiri received the letter from Bert Smith & Company in late December 1992. From the DCPL's reasonable perspective, as reflected in Mr. Molumby's communication to Ms. Okyiri initiating the adverse action, this letter was not a minor communication regarding, say, the failure to order some stationery on time. Rather, the letter concerned allegations of unlawful expenditure of federal funds, as well as the possibility that the DCPL would have to reimburse the federal government. These subjects were central to Ms. Okyiri's area of responsibility and potentially implicated the kind of fiscal mismanagement that she claimed to be determined to uproot. Moreover, Ms. Okyiri was not an untrained clerical employee, but the DCPL's chief financial officer. Nevertheless, she permitted the letter to lie in her in-box, unopened, for more than two months.

The ALJ concluded that Ms. Okyiri had no obligation to deliver the envelope to Dr. Franklin. According to the OEA, Ms. Okyiri was not obliged to pass the envelope on to the Director because she had reason to believe that he already had the original and that she only had a copy. With due respect to the authors of these opinions, we find this reasoning unpersuasive. Indeed, in our view, the ALJ and the OEA construed the allegations against Ms. Okyiri unduly narrowly and therefore missed the main thrust of the charge.

Ms. Okyiri's failure to pass on the information to Dr. Franklin was a product of her failure to open the envelope for so extensive a period of time. Had she taken the elementary step of reading her mail, she would immediately have noticed that the envelope contained the original of a letter addressed to her, and not a copy of a letter to Dr. Franklin. Ms. Okyiri's purportedly "reasonable belief" that she had received only a copy of a communication to her superiors was induced by her own inexplicable failure to open her mail, or even to know what was in her in-box. The allegedly reasonable mistaken impression on which Ms. Okyiri relies was thus the product of her failure to do her job.

In *Garrett v. Mathews*, 474 F.Supp. 594 (N.D.Ala.1979), Bert D. Garrett, a professor at the University of Alabama, challenged the revocation of his tenure. The evidence showed, *inter alia*, that Garrett had been ordered by the chairman of his department to supply a list of publications. Garrett had failed to provide that list, and he had not opened relevant mail from the chairman. A hearing committee found that Garrett's failure to provide the list constituted "insubordination and dereliction of duty." *Id.* at 599. The court continued:

> Plaintiff's failure to open the mail from his superior was even a more odious indiscretion. Though, as plaintiff alleges, supplying a list of publications and opening mail may be nowhere written as job requirements, the court notes that not showing up for class naked is not a written job requirement either. Some things go without saying. Complying

---

**22.** The DPM sets forth a number of examples of inexcusable neglect of duty, some of which specify a maximum sanction for a first offense less severe than removal. Removal is authorized, however, for "negligence in performing official duties, including failure to follow verbal or written instructions." 16 DPM § 1618.1, 34 D.C.Reg. 1863. Given our appraisal of the seriousness of the neglect in this case, see pp. 25–28, *infra*, we believe that the OEA could reasonably find on remand (on an issue that it has not heretofore reached) that the sanction imposed was consistent with the DPM.

with reasonable requests from superiors and opening mail from superiors are among them. These offenses clearly could be such insubordination and dereliction of duty as to indicate dismissal. *Id.*

█ We recognize that not every negligent act or omission on the part of an employee warrants removal, and that the OEA's (and our) review of the exercise of managerial discretion, though deferential, must be meaningful. We believe that Justice Musmanno's eloquent language in *In re Shoaf,* 370 Pa. 567, 88 A.2d 871 (1952), albeit written in the somewhat different context of a proposed recall of elected officials, is instructive.

> People demand of their representatives government which is efficient and in meticulous keeping with the highest standards of devotion to their interests. But they are not prepared to dismiss their public officials simply because they do not achieve perfection in every minute detail of bureaucratic operation.

*Id.* at 873. But the DCPL could reasonably view Ms. Okyiri's conduct with respect to the Bert Smith & Company envelope as far more than a failure to "achieve perfection in every minute detail of bureaucratic operation." *Id.* In our view, the facts here are quite similar to those in *Garrett.* Ms. Okyiri, like Professor Garrett, failed to open important mail, with potentially disastrous results. To quote Mr. Molumby (who described himself as having been rendered "speechless" by Ms. Okyiri's inaction), Ms. Okyiri "knew we needed the information. She had the information. She had it for two and a half months. And she didn't give it to us." Recognizing that the burden of persuasion was on the DCPL, *see Parsons, supra,* 228 U.S.App. D.C. at 4, 707 F.2d at 1409, we conclude that the ALJ, the OEA, and the

trial judge erred as a matter of law in holding that the undisputed facts did not establish a grave breach of duty on Ms. Okyiri's part.[23] As a matter of managerial discretion, the DCPL could reasonably treat such a breach of duty as inexcusable.

#### (b) *Pretext.*

We are confronted, however, with the ALJ's finding that the charge of inexcusable neglect was a "pretext manufactured by the agency" to justify the DCPL's removal of Ms. Okyiri in retaliation for her efforts to protect the public fisc. Although the OEA did not explicitly adopt this finding, it did not reject it either and, as we have noted, it was the ALJ who heard the witnesses and watched them testify. The ALJ's finding in this regard raises some complex issues of law and fact which the OEA may be obliged to revisit on remand.

The DCPL asserts that the ALJ's finding of pretextuality lacks factual support in the record. We disagree. First, the ALJ found that, shortly before the discovery of the Bert Smith & Company letter, Dr. Franklin had fabricated a charge against Ms. Okyiri in relation to the Form PL 456 controversy. This finding was sustained by the OEA and by Judge Canan, and the DCPL has abandoned its efforts to have that finding set aside. The fabrication of one charge against Ms. Okyiri supports the inference of pretextuality with regard to a second charge instituted almost immediately thereafter.

Second, as we have noted, Ms. Okyiri was not the sole participant in the lackadaisical treatment of the Bert Smith & Company letter. Dr. Franklin, who signed the request to the Controller that further information be obtained, made no inquiry thereafter. Mr. Molumby, the person who accused Ms. Okyiri of dereliction of duty in a matter that he had described in his

---

**23.** Unlike the ALJ, the OEA, and the trial judge, we do not believe that the breach of duty turns in any way on Ms. Okyiri's credibility in asserting that, in the normal course, she would have received a copy but not the original. In our view, this testimony has no bearing on Ms. Okyiri's obligation to open her mail, ascertain its contents, and act accordingly.

charging letter as "critically important to our response to the audit," likewise took no action to ascertain what had become of Dr. Franklin's inquiry. Indeed, Mr. Molumby's inaction cannot be reconciled with any claim that top management was treating this issue with any measure of urgency. If a project is really of critical importance, then a competent manager does not hold his peace for fear of offending an underling.

Finally, the ALJ found that Ms. Okyiri was engaged in attempting to put an end to financially irresponsible practices at the DCPL, and that these activities generated opposition from her superiors. More evidence to this effect is developed in Part II of this opinion, dealing with the whistleblower case. Ms. Okyiri also testified that her dismissal was carried out in a vengeful and punitive manner, which could be viewed as incompatible with a discharge for the reasons stated by management.[24] Considering all of these factors, and especially in light of the ALJ's opportunity to assess the demeanor and credibility of the witnesses, we are satisfied that his finding of pretextuality is supported by the record.

We further conclude, however, that the ALJ's finding that the neglect of duty charge was a manufactured pretext may have been induced, in whole or in part, by a misapprehension on his part regarding the applicable legal principles. The ALJ apparently had the impression that Ms. Okyiri's retention of the Bert Smith & Company envelope in her in-box for more than two months, without opening it, and her consequent failure to inform Dr. Franklin of the envelope's contents, did not violate any duty that Ms. Okyiri owed

her employer. The ALJ's finding was thus predicated upon his apparent belief that there was no legitimate reason to discharge, or even discipline, Ms. Okyiri. We have held, however, that this belief was in error, and that in not opening her mail for more than two months, Ms. Okyiri failed to carry out a basic obligation of her office. Even if an employee committed a serious breach of duty, her discharge may still be pretextual, but it is obviously more difficult to find pretextuality in these circumstances than in a situation where the employee has carried out all of her obligations conscientiously and well.

We have held that "findings induced by, or resulting from, a misapprehension of controlling substantive legal principles lose the insulation of [the clearly erroneous rule], and a judgment based thereon cannot stand." *Murphy v. McCloud*, 650 A.2d 202, 210 (D.C.1994) (citations and internal brackets omitted). In *Murphy*, we were reviewing findings by a judge sitting without a jury, not by an administrative officer, but the present situation is indistinguishable in principle. Accordingly, and notwithstanding the extensive delays that the parties have already encountered as this controversy has moved, step by step, from the first arbiter to the sixth, we are compelled to remand this case to the OEA for reconsideration of the finding of pretextuality in light of the legal principles set forth in this opinion.[25]

On remand, the OEA will be presented with a legal issue which it apparently has not previously addressed, namely, whether the defense of pretext will lie in an adverse action proceeding such as this one.[26]

---

24. Ms. Okyiri testified:

> I wasn't allowed to go to my office. I said I needed to get my key to use the bathroom and they had to escort me. Ms. Raphael had to take me to my desk to retrieve my makeup kit and my key.
>
> * * * *
>
> Up until now I still have my personal belongings in the office. I was not allowed to go anywhere near the office. They had already changed the locks anyway, and

> therefore I just didn't see the need. I felt like they wanted to make an example out of me. They wanted to humiliate me.

25. But see note 37, *infra*.

26. Ms. Okyiri's attorney explicitly conceded before the ALJ that the allegations of whistleblowing were not at issue in the OEA proceedings. He did not acknowledge, however, that the general question of pretext was out of the case.

Where, as in this case, the employer alleges that an employee was discharged for a legitimate reason, and the employee claims that she was really dismissed for an impermissible reason, some courts have held that "the question is . . . one of fact for the jury.[27] The jury is always permitted to determine the employer's true reason for discharging the employee." *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880, 896 (1980). Other courts, however, take the position that "[t]he motives which actuate the master in discharging the servant are wholly immaterial, for the act is justified if any legal grounds therefor existed at the time . . . ." *Marnon v. Vaughan Motor Co.,* 189 Or. 339, 219 P.2d 163, 167 (1950) (en banc) (quoting *Von Heyne v. Tompkins,* 89 Minn. 77, 93 N.W. 901, 903 (1903)). This court has also stated in a somewhat different context that "[a]n act legal in itself, and violating no right, cannot be made actionable on account of the motive which superinduced it." *Venture Holdings, Ltd. v. Carr,* 673 A.2d 686, 690 (D.C.1996) (quoting *Adler v. Fenton,* 65 U.S. (24 How.) 407, 410, 16 L.Ed. 696 (1861)).

In reviewing Ms. Okyiri's discharge, as we have noted, the OEA's obligation is to ensure that managerial discretion has been properly exercised. *Stokes, supra,* 502 A.2d at 1010. If, as the ALJ initially found, the neglect of duty charge was a manufactured pretext, then the OEA must decide whether the discharge of an employee may properly be set aside where sufficient grounds exist for the employee's dismissal but where the employee was in fact removed for a different and legally insufficient reason. This legal issue must be addressed, at least in the first instance, by the OEA. *See Grillo v. District of Columbia,* 731 A.2d 384, 386–87 (D.C.1999) (citations omitted). If the OEA concludes

that pretext is a cognizable defense in this type of proceeding, then the case must be remanded to the ALJ for a determination by him as to whether, notwithstanding this court's conclusion that there was ample evidence of inexcusable neglect of duty, his finding of pretext in this regard still stands.[28]

## II.

## THE WHISTLEBLOWER CASE

### A. *The evidence.*

Ms. Okyiri also brought a separate civil action against Dr. Franklin claiming in substance that she had been removed from her position in retaliation for "blowing the whistle" on her superiors in connection with suspected unlawful activities at the DCPL. In this suit, Ms. Okyiri alleged that she had generated, and cooperated with, an investigation by representatives of the Office of the Inspector General (OIG) of certain allegedly improper financial practices at the DCPL. This investigation first addressed allegations of irregularities at the DCPL's bookstore, but it was later expanded to embrace a number of other matters, including Dr. Franklin's personal travel records. Ms. Okyiri asserted that the adverse action that resulted in her discharge was instituted in reprisal for her legally protected conduct in providing information to the OIG auditors and in resisting the unlawful expenditure of taxpayers' money in relation to the Greenlee voucher.

The whistleblower case came to trial before Judge Linda Turner Hamilton, sitting without a jury, on July 19, 1995, less than four weeks after the ALJ had ruled in Ms. Okyiri's favor in the proceeding before the OEA. The trial continued for twelve days in July and October of that

27. Here, the ALJ, as the trier of fact, stands in the shoes of the jury.

28. Alternatively, the OEA may, in the exercise of its discretion, first remand the case to the ALJ to reconsider his finding of pretextuality in light of our holding that Ms. Okyiri failed to carry out a basic obligation of her office. If the OEA elects this option, then it will have to decide the underlying legal issue only if the ALJ adheres to his initial finding.

year. In part, the proceedings were a reprise of the earlier hearing, with testimony from several of the same witnesses. A principal focus of the whistleblower trial, however, was the testimony regarding the OIG investigation. In her written decision signed on June 7, 1996, the trial judge described the relevant events:

> In late fall 1992, two auditors, John Panholzer and Roy Simmons, from the Inspector General's Office were assigned to the library. Mr. Simmons actually arrived at the library in January 1993 to begin the audit. Plaintiff was made the audit liaison by Dr. Franklin. It was decided that the bookstore and its problems would be first on the auditors' agenda. Soon the audit expanded beyond the bookstore moving to [X]erox monies and miscellaneous donations. Eventually, the audit moved to defendant's personal travel records.[29] Plaintiff also alerted the auditors to the lack of control over cash donated to the library specifically telling them that the Director took the money to his office to count. At some later point in the audit, the auditors instructed plaintiff to pull all contracts over a certain dollar amount. It was undisputed at trial that plaintiff was cooperating fully with the auditors.

> The auditors quickly discovered the embezzlement of funds within the library. Indeed, Mr. Panholzer testified that he believed there was "systematic stealing of money" over a two year period. Mr. Panholzer testified that no one other than plaintiff was the "source" of their information. Plaintiff also brought to the auditors' attention a seemingly personal relationship between the photographer used by the library and the Director. It was plaintiff's view that the photography services provided to the library should be put to a competitive bid. Finally according to Mr. Panholzer, defendant was "leaning" on plaintiff by the end of March 1993.

* * * *

> Mr. Simmon[s] corroborated that plaintiff began to feel the pressure for her cooperation with him.

The DCPL contended that Ms. Okyiri was not a genuine whistleblower and that she was discharged for legitimate and compelling reasons. Both Dr. Franklin and Mr. Molumby denied any knowledge that Ms. Okyiri had provided unfavorable information about them to the OIG auditors. The DCPL also established that on the date that she was discharged, Ms. Okyiri had formally requested whistleblower protection from the OIG, and that the Inspector General had declined to provide such protection.[30] Mr. Molumby testified that on a number of occasions, predating the controversies over the Greenlee voucher and the Bert Smith & Company letter, Ms. Okyiri had acted in an uncooperative and adversarial fashion, but that no disciplinary action was taken against her at that time. Mr. Molumby also insisted that he had instituted the adverse action against Ms. Okyiri solely on account of her insubordination and neglect of duty.

**29.** It came out later at trial that Dr. Franklin was required to reimburse the city for outstanding travel advances, and he was subsequently criminally prosecuted and convicted on conflict of interest charges.

**30.** In a letter dated May 24, 1993, the Inspector General wrote to Ms. Okyiri that, following a thorough review, he had "concluded that the adverse action instituted against you was not based upon any action or inquiry by OIG, or any information provided [to] this office by you.... [A]ny information regarding possible misconduct occurring at the library, which formed the basis of an OIG review, was in fact brought to our attention by other library personnel, and you provided no information which OIG had not already received or discovered." The Inspector General was not called as a witness by the DCPL, however, and Ms. Okyiri had no opportunity to cross-examine him with respect to the assertions in this letter. The OIG auditors who did testify stated that Ms. Okyiri provided them with valuable information.

B. *The trial judge's decision.*

The trial judge found that Ms. Okyiri "was a compelling witness—she impressed the court as a truthful individual who entered a new job excited, ambitious and stepped on some toes as a result." Although the judge was perhaps too polite to say so, she was apparently a good deal less persuaded of the veracity of some of the DCPL witnesses, and she resolved all of the credibility issues in favor of Ms. Okyiri. Believing Ms. Okyiri rather than the DCPL representatives (and, implicitly, the OIG auditors rather than the Inspector General's letter), the judge rejected the DCPL's claim "that it was the defendant and Mr. Molumby on their own accord who alerted the Inspector General's office," and instead "credit[ed] plaintiff's testimony that it was at her urging." Without explicitly making a finding on the point, the judge, like the ALJ, evidently disbelieved Dr. Franklin's version of the Form PL 456 incident. With respect to Mr. Molumby's claims of "uncharged instances of misconduct," the judge found that "plaintiff who was never admonished at the time gave wholly credible explanations for the situations. There were some she simply could not recall." Finally, rejecting the DCPL witnesses' contrary testimony, the judge found that Ms. Okyiri's disclosures to the OIG were a substantial factor in her removal.

Judge Hamilton apparently did not attribute a great deal of significance to the lengthy sojourn in Ms. Okyiri's in-box of the unopened envelope from Bert Smith & Company. In fact, the judge consigned the issue to a footnote in which she briefly described the incident, but then dismissed it because

[a]t trial, Mr. Molumby testified that although the information sat on plaintiff's desk for months, the issues were resolved in the library's favor with no sanctions or fines based on delay.

The judge then turned to the legal issues. After quoting the relevant proscriptions of the whistleblower statute,[31] the judge wrote that

in order to prevail, plaintiff must demonstrate by a preponderance of the evidence the disclosure was a protected whistleblowing activity, *Clark v. Department of the Army,* 997 F.2d 1466 (Fed. Cir.1993); *Marano v. Department of Justice,* 2 F.3d 1137 (Fed.Cir.1993), and that the disclosure was a substantial factor in bringing about the personnel action. *Arthur Young & Company v. Sutherland,* 631 A.2d 354 (D.C.1993). The burden then shifts to the defendant to demonstrate by clear and convincing evidence that it would have taken the same personnel action against the whistleblower even in the absence of the protected disclosure. *Marano v. Department of Justice, supra.*

(Footnote omitted.) Applying this standard to the record before her, the judge ruled in Ms. Okyiri's favor:

Based on the plaintiff's testimony and the corroboration presented at trial, the court finds that plaintiff has demonstrated by a preponderance of the evidence that she was engaged in a protected whistleblowing activity. Plaintiff reported to her supervisors a reasonably held belief that payment of the Greenlee voucher violated Mayor's Memorandum 83–68. The court further finds that plaintiff's disclosures to the auditors, a public body within the meaning of § 1–616.3, were protected disclosures in that

31. At all times relevant to this appeal, D.C.Code § 1–616.3(b) (1992) provided, in pertinent part, that District agencies

shall not take any retaliatory action against an employee who:
(1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice that the employee rea-

sonably believes is a violation of a law or rule promulgated pursuant to law, `...`; [or]
(2) Provides information to ... any public body conducting an investigation, hearing, or inquiry into an alleged violation of a law or rule promulgated pursuant to law....

she reasonably believed violations of the law were occurring. It is also apparent from an examination of the evidence, that the disclosures were a substantial factor in her termination. Looking at the timing of the termination, the court notes that the letter of warning and the termination came at a time when, according to the testimony, plaintiff was beginning to feel the heat for her cooperation. Plaintiff had never been confronted with any personnel action or substantive complaints from her supervisors until the auditors began to step up their investigation. Additionally, there is no credible evidence in this record to explain the disparity in treatment between plaintiff's conduct which [led] to her dismissal and the treatment of those engaging in suspected illegal conduct.[32] Lastly, the court finds that the defendant has simply failed to come forward with clear and convincing evidence to support a finding that the *same* personnel action would have occurred in any event.

(Emphasis in original; footnote omitted.)

C. *Sufficiency of the evidence.*

The DCPL claims that the trial judge's findings are not supported by the evidence. In particular, according to the DCPL, there is no evidence that Dr. Franklin or Mr. Molumby were aware of any disclosures critical of them by Ms. Okyiri to the auditors. The DCPL points to the denials by Franklin and Molumby of any such knowledge, and argues that Ms. Okyiri's alleged whistleblowing—an activity of which the DCPL supposedly knew

nothing—therefore could not have been a substantial factor in the decision to remove her from her position.

■■■ We are not persuaded by this contention. As an appellate court, we must view the record in the light most favorable to Ms. Okyiri, the party that prevailed in the trial court, and we must take into account the judge's superior opportunity to assess credibility and to draw reasonable inferences from the evidence. *See, e.g., In re S.G.,* 581 A.2d 771, 774–75 (D.C.1990). We may set aside the judge's factual findings only if they are clearly erroneous. *See* D.C.Code § 17–305(a) (1997); Super. Ct. Civ. R. 52(a). We are also mindful that "circumstantial evidence may be more certain, satisfying and persuasive than direct evidence," *Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989) (citations omitted), especially where, as here, the existence *vel non* of a legally impermissible intent is at issue.[33]

One can often learn a great deal from the timing of events. In this case, the adverse action against Ms. Okyiri came close on the heels of her collaboration with the OIG auditors and the expansion of their inquiry into sensitive areas, such as Dr. Franklin's travel records. It is, of course, possible that, even though the auditors were dealing with numerous DCPL employees, Dr. Franklin had no idea what Ms. Okyiri might be telling the OIG. But the judge was not compelled to believe that Dr. Franklin was unaware of what was going on, or that the disclosures and Ms. Okyiri's removal were unrelated.

---

**32.** The judge's reference is apparently to the case of a voucher examiner, Robin Proctor, which was discovered as a result of the OIG investigation. Ms. Proctor was suspended without pay, but not discharged, after allegedly having misappropriated DCPL funds.

**33.** "Intent ordinarily cannot be proved directly, because there is no way of fathoming and scrutinizing the operations of the human mind." *United States v. Moore,* 140 U.S.App. D.C. 309, 312 n. 4, 435 F.2d 113, 116 n. 4 (1970) (quoting Criminal Jury Instructions for

the District of Columbia, No. 43 (1966)). Moreover, just as "proof of a civil right[s] violation [does not] depend on an open statement by an official of an intent to discriminate," *Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir.1970), so, too, a plaintiff in a whistleblowing case should be permitted to prove circumstantially, and without a *mea culpa* by an agency representative or other direct evidence of wrongful animus, that the defendants knew of her protected activities and acted pursuant to a retaliatory motive.

Moreover, as one librarian testified, there was extensive discussion among the DCPL employees regarding the OIG audit, and it is common knowledge that such a grapevine can often travel directly to the boss. Ms. Okyiri spilled the beans to the OIG auditors, and shortly thereafter she was cashiered. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C.1993) (quoting *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992)).

The testimony of the auditors provides further circumstantial support for the common-sense inference that the head of an institution under investigation by the OIG was aware of the course of the investigation. Ms. Okyiri had been designated to deal with the auditors, and her superiors obviously knew that she was dealing with them about *something.* One auditor, Mr. Panholzer, testified that as the investigation proceeded, Dr. Franklin began to play "hardball" and to "stonewall" the auditors by placing annoying procedural obstacles in their path (*e.g.,* by requiring a written request from the auditors whenever they wished to inspect any document, and by denying them a request for a lock to secure their workroom). Ms. Okyiri also adduced testimony from the auditors and from DCPL employees showing that, after Ms. Okyiri was discharged, the level of cooperation with the auditors was drastically reduced. Resorting to the vernacular, Ms. Okyiri claimed that she was "feeling the heat," and the record supports an inference that others were feeling it too.

Finally, there was evidence that Dr. Franklin fabricated the charge relating to Form PL 456 and that DCPL witnesses gave testimony that the judge did not credit. Such conduct may give rise to an inference of consciousness of guilt, which "operates, indefinitely though strongly, against the whole mass of alleged facts constituting [Dr. Franklin's] cause." *Mills v. United States,* 599 A.2d 775, 783–84 (D.C.1991) (italics omitted) (quoting 2 J. WIGMORE, EVIDENCE, § 278 at 133 (Chadbourn ed.1979)).[34]

### D. *The need for a remand.*

#### (1) *The error as to inexcusable neglect of duty.*

In spite of our rejection of the DCPL's challenge to the sufficiency of Ms. Okyiri's evidence, we are persuaded that a remand is necessary. We reach this conclusion because the trial judge's decision, like that of the OEA, appears to be predicated on a perception that Ms. Okyiri's retention of the Bert Smith & Company letter in her in-box for more than two months, and her consequent failure to pass it on, did not warrant a sanction by the DCPL, or at least the sanction actually imposed, namely, removal from her position. The only reason suggested by the trial judge for this conclusion was that no harm actually came to the agency. In our view, however, this favorable outcome was entirely fortuitous and did not significantly alleviate the gravity of Ms. Okyiri's neglect of duty.

As we noted in our discussion of the proceedings before the OEA, see Part I C(3)(b), *supra,* a fact-finder's belief that an employee has done nothing to deserve to be disciplined may be an important factor in the court's determination whether a sanction was imposed for an illegitimate and pretextual reason. When, as in this case, we are satisfied that such a belief

---

**34.** The DCPL points out that the adverse action was initiated by Mr. Molumby, and not by Dr. Franklin, and asserts that Ms. Okyiri's disclosures to OIG did not reflect unfavorably on Mr. Molumby. Mr. Molumby testified that the decision to attempt to remove Ms. Okyiri was his alone. The record shows, however, that Dr. Franklin and Mr. Molumby worked closely together and that Dr. Franklin was personally involved to a substantial degree in the disputes over the Greenlee voucher and Form PL 456. The judge was not obliged to suppose that Dr. Franklin, the head of the agency, had nothing to do with the decision to get rid of the DCPL's chief financial officer.

was erroneous, the judge must reassess her decision and accord appropriate weight in her calculus to our conclusion that, on the undisputed facts, legitimate grounds existed for Ms. Okyiri's removal for inexcusable neglect of duty.

We emphasize, however, that our disposition does not require the trial judge, on remand, to rule in either party's favor. Adapting to the present case the language of the federal Merit Systems Protection Board, "[t]he issue is not whether [Ms. Okyiri] was the ideal employee or whether [the DCPL] could have relied on [the Bert Smith & Company envelope] incident[ ] to terminate [her]. Rather, the issue is whether [the DCPL] actually did rely on these incidents to terminate [Ms. Okyiri] independent of the latter's protected conduct ." *Special Counsel v. Nielson,* 71 M.S.P.R. 161, 170 (1996) (citation omitted). As the Supreme Court explained in a different but related context, once an employee has shown that protected conduct was a motivating factor in the employer's decision not to rehire him, the trial court must "determine whether the [employer] ha[s] shown by a preponderance of the evidence that it would have reached the same decision as to [the employee's] re-employment even in the absence of the protected conduct." *Mount Healthy Sch. Dist. Bd. of*

*Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

*(2) Clear and convincing evidence.*

█ In her written decision, the trial judge wrote that once Ms. Okyiri had made out her *prima facie* case, the burden was on the DCPL to demonstrate *by clear and convincing evidence* that it would have taken the same personnel action against her even in the absence of the protected disclosure. The DCPL claims that this was error and that its correct burden was to rebut the *prima facie* case by a preponderance of the evidence.[35] Ms. Okyiri asserts that the DCPL's objection to the "clear and convincing" standard has not been preserved for appeal, but even assuming, without deciding, that it has not been preserved, we think it appropriate, in light of our remand for further proceedings, to resolve the issue now and to obviate the need for a further appeal regarding the burden of proof.[36]

We think that the DCPL has the best of the argument on this point. In adopting the "clear and convincing" standard, the trial judge relied on *Marano v. Department of Justice,* 2 F.3d 1137, 1141 (Fed. Cir.1993). That case, however, was brought under the federal Whistleblower Protection Act (WPA), enacted in 1989, which explicitly requires rebuttal of the

**35.** The DCPL also argues that the correct test under the pre–1998 District statute should have been one based on case law under the earlier federal whistleblower statute, the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 2301 *et seq.* (1988). *See, e.g., Warren v. Department of the Army,* 804 F.2d 654, 658 (Fed.Cir. 1986); *Hagmeyer v. Department of Treasury,* 757 F.2d 1281, 1284 (Fed.Cir.1985). We agree. The DCPL has not persuaded us, however, that the test used by Judge Hamilton differed significantly either from the standard set forth in *Warren* and *Hagmeyer,* or from somewhat analogous decisions in *Mount Healthy Sch. Dist. Bd. of Educ., supra,* and *Arthur Young & Co. v. Sutherland,* 631 A.2d 354 (D.C.1993), except with respect to the requirement that the employer rebut the employee's *prima facie* case with clear and convincing evidence. Indeed, the DCPL's criticism of the judge's articulation is focused almost entirely upon her use of the "clear and

convincing" standard. In any event, on remand, the trial judge should apply the standard set forth in *Hagmeyer,* namely:

> In order for [the employee] to prevail on [her] contention, [s]he has the burden of showing that (1) a protected disclosure was made, (2) the accused official knew of the disclosure, (3) retaliation resulted, and (4) there was a genuine nexus between the retaliation and [the employee's] removal. 757 F.2d at 1284.

**36.** We note, however, that the trial judge's opinion, and in particular her assessment of the credibility of the witnesses, suggest that her reliance on the "clear and convincing" standard may not have been decisive as to the result, and that Ms. Okyiri would have prevailed even under a "preponderance" standard.

plaintiff's *prima facie* case with clear and convincing evidence. *See* 5 U.S.C. § 1221(e)(2) (1996). At the time that this action was brought, the District's whistle-blower statute contained no such provision.

In civil litigation, a party with the burden of persuasion on an issue must ordinarily establish the relevant facts by a preponderance of the evidence. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 253, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). "Exceptions to this standard are uncommon ...." *Id.* In *Hopkins,* a "mixed-motive" employment discrimination case, the Supreme Court declined to impose on the employer the burden of proving by clear and convincing evidence that it would have denied partnership status to the plaintiff even in the absence of discrimination. *Id.* The Court was "persuaded that the better rule is that the employer must make this showing by a preponderance of the evidence." *Id.*

Civil rights statutes have traditionally been generously construed. *See, e.g., Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (Congress has accorded the "highest priority" to the protection of the right to equal opportunity); *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 889 (D.C.1998). We are reluctant to read a silent "clear and convincing" test into a whistleblower statute where departures from the conventional standard—*i.e.,* preponderance of the evidence—are so rare that the Supreme Court has declined to make an exception even in interpreting a statute designed to eradicate invidious discrimination based on race.

Our decision is reinforced by legislative developments in the District of Columbia. The recently enacted DCWRA, see note 1, *supra,* which was passed to strengthen the protections provided to whistleblowers, differs from the statute in effect when this action is brought in that the new statute expressly provides that

> once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1–616.13 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the employing District agency to prove *by clear and convincing evidence* that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

D.C.Code § 1–616.14(b) (1999) (emphasis added). This provision was designed, according to one of its principal proponents, to change the agency's burden from "a preponderance of the evidence" to "clear and convincing evidence." *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, Report on Bill No. 12–191, District of Columbia Whistleblower Amendment Act of 1998, Attachment E, Testimony of Thomas Devine, Government Accountability Project, at 6 (Sept. 24, 1997). We discern no persuasive reason for concluding that prior to the enactment of the DCWRA, an unconventional requirement of clear and convincing evidence existed under a statute that gave no indication that application of such a standard was intended.

## III.

### CONCLUSION

For the foregoing reasons, the judgments in both cases are vacated, and each case is remanded for further proceedings consistent with this opinion.

*So ordered.*[37]

---

**37.** We note that the remand in the whistle-

blower case requires action at only a single

decisional level, namely, in the trial court. The remand in the OEA case may require further fact-finding by the ALJ and additional review at several other levels. If the trial judge were to rule for Ms. Okyiri on remand of the whistleblower case, then Ms. Okyiri would receive all the relief available in the adverse action case, and the appeal in that case would be rendered moot. In the interest of judicial economy, Judge Canan may wish to consider entry of a stay in the adverse action case pending Judge Hamilton's disposition on remand of the whistleblower case. Such a stay could, of course, be vacated in the interest of justice if such action is warranted by future events.