*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CV-1514 & 12-CV-1544

DARRYL LOVE AND ALPHONSO BRYANT, APPELLANTS,

v.

DISTRICT OF COLUMBIA OFFICE OF EMPLOYEE APPEALS AND
DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAP-6180-09 & CAP-6181-09)

(Hon. Mary Ellen Abrecht, Senior Judge)

(Argued January 30, 2014                                    Decided May 8, 2014)

*J. Michael Hannon* for appellants.

*Jason Lederstein*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee District of Columbia Department of Corrections.

*Lasheka Brown Bassey* Filed a statement in lieu of brief for D.C. Office of Employee Appeals.

Before GLICKMAN and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:  We review here a judgment of the Superior Court

affirming a decision by the Office of Employee Appeals (OEA), which upheld the

firing of two correctional treatment specialists (Specialists), appellants Alphonso Bryant and Darryl Love, by the District of Columbia Department of Corrections (DOC). We sustain the findings of appellants' negligence in connection with the escape of two prisoners from the D.C. Jail, but we reverse and remand the case for further proceedings to determine the appropriate penalties.

## I.

### *The Escape*

The DOC decision to fire appellants arose out of a sensational jail escape. On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility (commonly called the D.C. Jail). Leaks was working, unsupervised, on a cleaning detail, when he used his work-detail identification badge to enter a cleaning supply closet. He took a commercial floor buffer and then met Jones, who had used a work-detail badge belonging to a different inmate. The pair changed from orange jumpsuits into blue clothing usually given to inmates upon release. They then used the large buffer to break into the warden's second floor office and smash the window leading out of the jail. They slid down a canopy and soon caught a Metro train for a brief taste of freedom before they were apprehended the next day without incident.

At the time, Leaks and Jones were among the most dangerous offenders housed at the D.C. Jail. Jones was awaiting two separate trials for attempted murder and first-degree murder, while Leaks was in jail awaiting trial as an accessory to Jones's alleged first-degree murder. Leaks was also being held under a twelve-year sentence on a conviction for violation of his 2003 parole from a twenty-four year sentence for violent crimes. Jones and Leaks were each subject to a separation order notifying correctional officers not to house them in the same facility because of their alleged linkage in the first-degree murder case. (Thus, both should not have been confined in the D.C. Jail.) The hard copy of the file with the separation order was missing from the D.C. Jail at the time but was available to DOC staff electronically.

### *Bryant's and Love's Responsibilities and Allegedly Negligent Conduct*

As Specialists, Bryant and Love were responsible, respectively, for screening inmates for unsupervised work details and for classifying inmates based on security risk. For part of his work-eligibility screenings, Bryant used the Non-Industrial Pay System (NIPS). NIPS disqualifies convicted felons with total sentences exceeding five years; inmates subject to a separation order; parole violators with more than two years remaining before release; and inmates with an outstanding detainer.

Love's job involved classifying a new inmate within three days of entry to the jail and reclassifying an inmate every sixty to ninety days thereafter. A Specialist's classification determines the inmate's security status as minimum, medium, or maximum based on a ten-point grading system that accounts for: the severity of the current offense; the severity of prior convictions; any history of escapes or escape attempts; and any history of institutional violence. Inmates classified as minimum or medium security are eligible for work details, but DOC prohibits maximum security inmates from working at the jail. Specialists base classifications and reclassifications on a point system established in Chapter Two of the DOC Technical Reference Manual, which requires that an inmate with ten points or more be classified as maximum security.

Bryant and Love appear to have been model employees until the escapes, whereupon DOC cited several instances of negligent conduct by each that allegedly contributed to the Jones and Leaks elopements.[1] Only two of these

---

[1] DOC alleged the following negligent actions by Bryant: failure to properly screen Leaks for work eligibility using the NIPS Personnel Action Form; failure to review the inmates' files; failure to properly apply the eligibility requirements for convicted felons (with parole detainer); failure to note a separation order; and failure to note escape history. DOC alleged these negligent actions by Love: failure to properly reclassify Leaks considering his history of escapes; failure to follow the point system according to Chapter Two of the

(continued . . .)

allegations—one applicable to each appellant—are relevant to this appeal: that (1) Bryant had found Leaks eligible for work-detail despite the twelve years remaining on his sentence; and that (2) Love had classified Leaks as only a medium security risk without factoring into the classification Leaks's 1992 attempted escape from jail.

Bryant later explained that he had not been aware that Leaks had more than five years remaining on a sentence because Leaks's file reflected that he had completed his sentence and was only in jail waiting determination of his status for violating parole. Love also had an excuse. He explained that he had not considered Leaks's history of escape because Leaks had only been arrested for, not convicted of, an attempted escape in 1992, and Love believed that his duty was limited to counting only convictions.

Despite the recapture of Leaks and Jones within twenty-four hours, the jail break was a public embarrassment for DOC, which responded by immediately suspending thirteen employees, including Bryant and Love, for negligence.

---

(. . . continued)
Technical Reference Manual on reclassifications; and failure to properly score Leaks's parole violation considering the underlying assault charge.

## II.

### *Office of Administrative Hearings—First Review (2007)*

At a press conference on July 26, 2006, DOC Director Devon Brown and other District of Columbia officials announced that eleven of the suspended DOC employees, including appellants, had been fired for neglecting their duties and contributing to the jail break. After these summary removals, Director Brown entered into a Memorandum of Understanding with the Office of Administrative Hearings (OAH) whereby an OAH administrative judge would conduct a hearing to review these terminations in accordance with Chapter Sixteen of the District of Columbia Personnel Manual and the Collective Bargaining Agreement between DOC and the Fraternal Order of Police.

After the hearing, OAH issued a "Report and Recommendation" concluding that the terminations could not be sustained and recommending that DOC reinstate all the fired employees. Brown disagreed, so he requested that OAH reconsider. On February 5, 2007, a multi-judge OAH panel held another administrative hearing, after which the panel issued findings similar to those of the first administrative judge and again rejected the terminations. Brown maintained his disagreement and refused to issue a final decision. On March 12, 2007, the fired employees petitioned this court for a writ of mandamus compelling Director

Brown to reinstate them.[2]   Four days later, Brown rescinded the employees'
summary removals, in order to avoid a ruling by this court on the requested writ,
but the very next day he served the employees with new notices of proposed
terminations based on the same charges.

### Dr. Lesansky's Recommendations (2007)

Brown appointed a DOC employee, Henry R. Lesansky, Ph.D., as the new
hearing officer for the proposed terminations.[3]   Dr. Lesansky held hearings for
Bryant and Love on July 9, 2007, and on September 25 recommended upholding
the terminations.  While DOC's final decision was pending, appellants and several
other employees sought compensatory, injunctive, and declaratory relief in federal
court alleging a denial of civil rights protected under 42 U.S.C. § 1983 (2001).
The U.S. District Court for the District of Columbia granted DOC's motion to
dismiss[4] based on the terms of the collective bargaining agreement and the

---

[2]   *See Washington v. District of Columbia Dep't of Corrections*, App. No.
07-OA-14, denied as moot April 25, 2007.

[3]   Appellants state in their brief that "Dr. Lesansky was not an 'independent'
hearing officer as promised to Bryant and Love in their August 24, 2006 Notices of
Removal, and guaranteed by D.C. Law."  Appellants cite no authority for this
statement, but DOC does not question it.

[4]   *See Washington v. District of Columbia*, 538 F. Supp. 2d 269, 274 (D.D.C.
2008).

(continued . . .)

Comprehensive Merit Personnel Act,[5] which required the employees to exhaust administrative remedies through the Office of Employee Appeals (OEA) or a grievance arbitration.[6]

### *Office of Employee Appeals—First Decision (2009)*

The aggrieved employees appealed DOC's termination decisions to OEA on January 14, 2008. Almost a year later, during December 2008, Senior Administrative Judge Lim, assuming jurisdiction under the District's Comprehensive Merit Personnel Act,[7] held three days of hearings over the propriety of nine of the job terminations, including Bryant's and Love's. For OEA, Judge Lim issued his first set of findings and conclusions on June 22, 2009. He overturned all the terminations except those of Bryant and Love, whom he found negligent with evidence substantial enough to support their terminations of

---

(. . . continued)

[5] D.C. Code §§ 1-601.1 through 1-636.03 (2001).

[6] In January 2010, the U.S. District Court for the District of Columbia denied the employees' motion for relief from the court's 2008 order dismissing their civil rights claims, see *supra* note 4, ruling that the employees were not entitled to relief while awaiting resolution of administrative proceedings before OEA contesting propriety of their terminations. *See Washington v. District of Columbia*, 680 F. Supp. 2d 183, 186-87 (D.D.C. 2010).

[7] See *supra* note 5.

employment.[8]

Referencing the documents that were indisputably available to Bryant and Love, Judge Lim found "too many red flags" to justify classifying Leaks as work-eligible, namely, "lengthy and violent criminal history, escape attempt, violation of probation, length of sentence remaining, the presence of a separation order, the fact that Leaks was initially rated as a maximum security risk, etc." The judge stressed, in particular, that Bryant and Love had neglected their duties by failing to exercise due diligence to locate the missing separation order that precluded housing both Jones and Leaks at the D.C. Jail. Locating that order, wrote the judge—a responsibility that Bryant, at the hearing, essentially admitted he had[9]—would have alerted DOC officers of the need, at the very least, to keep the alleged accomplices apart, and thus could have prevented their working together to escape. Furthermore, according to the judge, Love's classification of Leaks as medium

---

[8] Judge Lim stated that he based his decision on the testimonies of three aggrieved employees (Bryant, Love, and Cynthia Washington) and three DOC officials (Deputy Warden for Support Services, Leona Bennett; Head of DOC Office of Internal Affairs, Wanda Patten; and Director Devon Brown). The judge also considered DOC manuals and classification systems as exhibits. The entire OEA record is substantial and consists of eleven volumes submitted to this court for review on appeal.

[9] During his testimony at the hearing, Bryant had admitted his duty to review Leaks's file, which (the judge found) included a duty to locate the institutional file containing the separation order.

security was negligent, for it made Leaks eligible for work detail and thus allowed Leaks unsupervised access to the floor buffer that he and Jones had used to break out. Appellants had therefore created "a potential danger to the public," said the judge. In sum, Judge Lim concluded that both Bryant and Love had been negligent, and that their negligence had contributed to the escapes.

Judge Lim then turned to the proposed penalties. He credited Director Brown's testimony that he had "carefully considered the Douglas factors in coming up with the appropriate penalty" of termination.[10] He then concluded that Brown had not abused his discretion in terminating appellants' employments and affirmed

---

[10] *See Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (M.S.P.B. April 10, 1981). In *Douglas*, the United States Merit Systems Protection Board announced twelve factors relevant to determination of an appropriate penalty for a government employee's job-related misconduct, such as: the nature and seriousness of the offense; the employee's job level, past work record, and past disciplinary record; likely effect of the offense on the employee's ability to perform at a satisfactory level; consistency of proposed penalty with those imposed for similar offenses and with an applicable agency table of penalties; notoriety of the offense; impact on agency reputation; clarity of the rules violated; potential for employee rehabilitation; mitigating circumstances; and adequacy of alternative sanctions.

In *Stokes v. District of Columbia*, 502 A.2d 1006, 1010-11 (D.C. 1985), this court essentially adopted *Douglas* to aid our review of employment terminations, reviewed by OEA, under the Comprehensive Merit Personnel Act of 1978, D.C. Code §§ 1-601.1 through 1-637.2 (1981) (CMPA) (presently codified at D.C. Code §§1-601.01 through 1.636.03 (2012 Repl.)).

the DOC decisions.[11]

*Superior Court—First Review (2010)*

Thereafter, Bryant and Love appealed Judge Lim's (OEA's) decision to the Superior Court pursuant to D.C. Code § 1-606.03 (d) (2006).[12]  On March 22, 2011, in separate decisions for each appellant, Judge Abrecht affirmed in part and reversed in part.  She affirmed the OEA ruling that each Specialist had been negligent but held that DOC's decision to terminate Bryant's and Love's employments was based on greater negligence than the record supported. Specifically regarding Bryant, the judge concluded that the only negligence supported by the record was the "February 14, 2006 approval of Leaks for off-unit work detail, in spite of the fact that he had more than five years remaining on his sentence. . . .  Substantial evidence does not exist to show that he failed to give

---

[11] S*ee Stokes*, 502 A.2d at 1010-11 ("Only if the Agency failed to weigh the relevant factors or the Agency's judgment clearly exceeded the limits of reasonableness, is it appropriate for [OEA] to specify how the Agency's penalty should be amended.  [OEA] is guided in this matter by the principles set forth in *Douglas v. Veterans Administration* [*supra*]") (quoting *Employee v. Agency*, 29 D.C. Reg. 4565, 4570 (1982)).

[12] Section 1-606.03 (d) provides:  "Any employee or agency may appeal the decision of the Office [of Employee Appeals] to the Superior Court of the District of Columbia for a review of the record and such Court may affirm, reverse, remove, or modify such decision, or take any other appropriate action the Court may deem necessary."

proper attention to *other* functions of his position." As to Love, the judge ruled that the record supported only a finding of negligence for classifying Leaks as a medium security risk and thus work-eligible despite his escape history.

Accordingly, ruled the judge, OEA had upheld the terminations on several findings of negligence that lacked evidentiary support. For each appellant, Judge Abrecht concluded, "this court will remand the penalty matter to the OEA for reconsideration in light of this court's findings of the limited nature of [each appellant's] negligence and the tenuous connection of [each appellant's] negligence to the escapes." On May 13, 2011, OEA ordered DOC to redetermine appropriate penalties for appellants' respective negligent actions based on the Superior Court's rulings.

### *Department of Corrections—Reconsideration of Penalties (2011)*

Before the next DOC decision, Thomas Hoey replaced Devon Brown as director. On June 30, 2011, Hoey announced his own *Douglas* analyses based on appellants' personnel files, their adverse action files, relevant portions of the testimony before Judge Lim, the exhibits of record, and the judges' decisions. Hoey then compared appellants' actions to previous DOC disciplinary actions for similar misconduct, as well as to the D.C. Municipal Regulations Table of

Penalties.

In applying ten of the *Douglas* factors to Bryant's case, Hoey acknowledged that Bryant had no previous disciplinary history and had above average performance evaluations before the jail break. He concluded, however, that Bryant's negligence had been a contributing factor to the escape, which jeopardized public safety and embarrassed DOC. Hoey perceived from the record a steadfast refusal by Bryant to acknowledge that his approval of Leaks for a work detail had been a mistake. Then, applying *Douglas* factor 10, Hoey found from this refusal that Bryant "lacked potential . . . for rehabilitation."[13] Hoey further found that termination of Bryant's employment would be consistent with previous terminations, meaning that "[a]ll employees who acted negligently in their duties that contributed to the escape of two inmates on June 3, 2006 were terminated." He also relied on the Table of Appropriate Penalties contained in § 1619.1 of the District of Columbia Personnel Manual, finding that "termination is an appropriate penalty for a first offense of this nature." The director summarized: Bryant had failed "to engage in the most ordinary of security practices" and had also failed to "comply with the NIPS Post Orders," which excluded from work-eligibility those prisoners with more than five years remaining on their sentence. Bryant's actions,

---

[13] See *supra* note 10.

concluded Hoey, had compromised DOC and justified termination of employment as the "appropriate penalty."

Hoey conducted a similar analysis of Love, finding that Love, violating his duty as a Specialist, had failed to account properly for Leaks's escape history. Hoey further found that Love had neglected to use the Technical Reference Manual properly in classifying Leaks as medium security. "Your miscalculation, twice, of inmate Leaks as a medium custody inmate" (referring to Love's initial classification and reclassification of Leaks) "and your mistake in accounting for his criminal history were contributing factors to the escape." Hoey acknowledged that Leaks and Jones may have escaped notwithstanding Love's miscalculation, but Hoey found that this did not excuse the mistake. Hoey explained (in language much like the words he applied to Bryant as well) that Love could not be rehabilitated as a Specialist:

> Your potential for rehabilitation is poor based on your insistence that you did not incorrectly score inmate Leaks' escape history. You continue to argue, with no corroboration, that you were correct in scoring inmate Leaks' escape history as a 0 because he had not been convicted of an escape charge in court. Since you cannot acknowledge that you incorrectly scored his escape history, you are not likely to be rehabilitated.

Director Hoey thus concluded that Love's misconduct sufficiently justified

termination as the appropriate penalty. Love and Bryant thereupon appealed to OEA the DOC decision to let their employment terminations stand.

### *Office of Employee Appeals—Second Decision (2011)*

On August 10, 2011, Judge Lim reviewed Director Hoey's re-imposition of the termination penalties in light of Hoey's revised *Douglas* factor analyses (based on the limited negligence findings previously sustained by Judge Abrecht). Judge Lim relied on the record from the 2008 evidentiary hearing, which he had conducted and Hoey had used for reconsideration. The only remaining question before OEA, said the judge, was whether Hoey's decision to maintain termination of employment as a penalty was "within the range allowed by law, regulation, or guidelines and clearly not an error of judgment."[14] After observing that substantial evidence supported the earlier findings that each appellant had individually "neglected his duty to properly reclassify an inmate[,]" which "did play a role" in the escapes; and after according deference to the DOC director's managerial discretion in personnel decisions, Judge Lim concluded that Hoey "did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." He then ruled that DOC's termination

---

[14] *See Employee v. Agency,* OEA Matter No. 1601-0158-81, *opinion and order on petition for review*, 32 D.C. Reg. 2915, 2916 (1985).

penalty for Bryant's and Love's respective defaults fell within the tolerable limit allowed by the Table of Penalties and was not a clear error of judgment.

### *Superior Court—Second Review of the Penalties*

Returning to Superior Court, Love and Bryant challenged OEA's affirmances of DOC's termination decisions as abuses of discretion. They argued that Judge Lim had failed to base his decisions on a sufficient nexus between their negligent acts and the prison escape. Judge Abrecht resumed her consideration of these cases and concluded that DOC had properly considered the *Douglas* factors in determining that termination was a penalty within reasonable standards of managerial discretion. She found no abuse of discretion in Judge Lim's "conscientious review" of the record and concluded that substantial evidence supported DOC's determinations. This appeal followed.

### III.

### *Appeal to This Court*

Bryant and Love appeal (1) the trial court's limited affirmance of Judge Lim's findings in his 2009 decision, which included that Bryant and Love had each

been negligent in one respect; and (2) the trial court's affirmance of the judge's second OEA decision in 2011, sustaining DOC's termination of their employments. This appeal is the first opportunity for appellants to challenge the terminations in this court after exhausting their administrative remedies before DOC and OEA.[15] For the following reasons, we conclude that OEA relied on substantial evidence to support DOC's findings of negligence, but we reverse OEA's affirmances of DOC's punishments. We agree with appellants that termination of their employments was arbitrary and capricious because Director Hoey misapplied *Douglas* factor 10 when he concluded that appellants lacked the "potential for rehabilitation."[16] We therefore reverse the termination orders and remand the case of each appellant to OEA for further proceedings as to their punishments.

### *Standard of Review*

"Although this appeal comes to us from the Superior Court, our scope of review is 'precisely the same' as in administrative appeals that come to us

---

[15] *See Fair Care Found., A.G. v. District of Columbia Dep't of Ins. & Sec. Regulation*, 716 A.2d 987, 993 (D.C. 1998) (holding that an appellant must exhaust its administrative remedy before seeking judicial review).

[16] See *supra* note 10.

directly."[17]  Therefore, we owe no deference to the trial court and review its determinations *de novo*.[18]  Our review, moreover, is limited to the administrative record developed by OEA, and we will affirm its decision "so long as [that decision] is supported by substantial evidence in the record and otherwise in accordance with law,"[19] including conclusions of law that "follow rationally" from OEA's findings.[20]

"The OEA reviews the severity of a penalty imposed upon an employee simply to ensure that the employer properly exercised its managerial discretion."[21]

---

[17]  *Johnson v. District of Columbia Office of Employee Appeals*, 912 A.2d 1181, 1183 (D.C. 2006) (quoting *Murchison v. District of Columbia Dep't of Public Works*, 813 A.2d 203, 205 (D.C. 2002)).

[18]  *See Johnson*, 912 A.2d at 1183.

[19]  *Settlemire v. District of Columbia Office of Employee Appeals*, 898 A.2d 902, 905 n.4 (D.C. 2006) (citing *Raphael v. Okyiri*, 740 A.2d 935, 945 (D.C. 1999)).

[20]  *Murchison*, 813 A.2d at 205; *Raphael*, 740 A.2d at 945.

[21]  *Jahr v. District of Columbia Office of Emp. Appeals*, 19 A.3d 334, 340 (D.C. 2011).

Thus, OEA's "review of an agency-imposed penalty is essentially to assure that the agency did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness."[22] We will reverse an OEA decision, however, that we conclude is "arbitrary, capricious, or an abuse of discretion."[23]

### *Sufficiency of the Evidence of Negligence*

### **Bryant**

Bryant argues that the record does not contain evidence sufficient to sustain Judge Lim's 2009 finding that he had been negligent in giving his "February 14, 2006, approval of Leaks for off-unit work detail, in spite of the fact that [Leaks] had more than five years remaining on his sentence" for violating parole. Judge Lim based his finding, in part, on the testimony of Leona Bennett, who served as Deputy Warden for Support Services at the time of the jail escape. Bennett testified that DOC policy prohibited an inmate with more than five years remaining on his sentence to serve on work detail. Bennett further testified that Bryant's scrutiny of Leaks's file in 2006 should have indicated to a Specialist in Bryant's position that Leaks had a detainer reflecting twelve years remaining on his

---

[22] *Stokes*, 502 A.2d at 1011; *Douglas*, 5 M.S.P.R. at 306.

[23] *Jahr*, 19 A.3d at 340 (quoting *Bagenstose v. District of Columbia Office of Employee Appeals*, 888 A.2d 1155, 1157 (D.C. 2005)).

sentence for convictions of violent crimes. To confirm Bennett's testimony, DOC entered in evidence a letter on which Bennett relied from the U.S. Parole Commissioner dated August 11, 2005, stating that Joseph Poindexter, a pseudonym for Leaks, had been sentenced as of September 24, 2003, to 4,383 days (twelve years) in prison on convictions of violent crimes. DOC also entered in evidence the NIPS training guide, regularly relied on by Bryant, which explains that a convicted felon whose sentence exceeds five years is not work-eligible.

On appeal, Bryant argues to the contrary, without evidentiary support,[24] that the only information at his disposal had shown that "Leaks was not serving any sentence; he was merely being held until a hearing occurred." Judge Lim, however, credited Bennett's testimony and the documentary evidence over Bryant's explanation and found Bryant negligent—substantially a credibility finding by an "administrative factfinder" to which we "give great deference."[25]

We uphold Judge Lim's negligence finding because we agree that the record

---

[24] Bryant cites only his own "Petitioners' Brief and Request for Hearing," which he has not included in the record on appeal.

[25] *Hutchinson v. District of Columbia Office of Employee Appeals*, 710 A.2d 227, 232 (D.C. 1998) (internal citations omitted).

on which he relied contains "substantial evidence"[26] that Bryant neglected his duty by classifying Leaks as work-eligible when Leaks had more than five years left on his sentence for violent crimes. We note in particular that Bryant acknowledged at the OEA hearing that the NIPS guidelines applied to him and are used "[t]o ensure that inmates are properly screened for possible work detail." Bryant also acknowledged that the NIPS guidelines required a Specialist to review "supplemental" information. Bryant agreed that such information would have included Leaks's "institutional file" that contained the August 11, 2005, letter of the U.S. Parole Commissioner confirming the longevity of Leaks's sentence—well beyond the five years that barred him from any work detail.

**Love**

Like Bryant, Love argues that Judge Lim lacked evidence substantial enough to find that Love had been negligent when classifying Leaks as eligible for work detail. Love testified at the OEA evidentiary hearing that Specialists were trained to assign points only for escapes that resulted in convictions. And Love maintains that he was "never aware that he was required to count escape history, as opposed to conviction, in his classification." He then argues that Leaks's escape history, including a 1992 escape from the D.C. Jail, did not reveal that Leaks had been

---

[26] *Brown v. Watts*, 993 A.2d 529, 532 (D.C. 2010).

convicted for escaping.

Deputy Warden Bennett testified, to the contrary, that based on the training manual[27] available to Specialists, as well on as her own supervisory experience, Specialists were supposed to assign five points to an inmate who had an escape or an attempted escape older than ten years. In calculating Leaks's score to determine work-eligibility, however, Love had not included any points for the 1992 escape. As a result, Love computed Leaks's final score as an "eight," meeting the standards for medium security and work-eligibility, rather than the required "eleven," which would have dictated maximum security and prohibited Leaks from working.

After explicitly considering Love's and Bennett's respective testimonies, and crediting Bennett while discrediting Love, Judge Lim found Love negligent for ignoring Leaks's escape history. Again, after granting the required deference to

---

[27] DOC entered in evidence its training manual, Chapter Two, "INSTRUCTIONS FOR COMPLETING DOC CUSTODY RECLASSIFICATION FORM," as part of its Exhibit 61 during the first OEA hearing. Part C of Chapter Two explains how to score "History of Escape or Attempts to Escape." Subsection Five instructs Specialists to enter five points "if the inmate escaped or attempted escape from a medium or high security facility over 10 years ago." There is no mention of the relevance of a conviction for the escape, only instructions for classification based on an instance of escape.

the judge's credibility determinations[28] and examining the record as a whole, we conclude that OEA's findings are supported by substantial evidence.[29]

### *Potential for Rehabilitation*: *Alleged Waiver*

We turn to appellants' argument that Judge Lim abused his discretion in upholding their job terminations, because Director Hoey did not correctly apply the *Douglas* factors in determining the appropriate punishments. Specifically, Bryant and Love argue that Hoey improperly analyzed their capacity for rehabilitation as Specialists by imputing to them a fatal "lack of remorse." As noted earlier, in Hoey's revised *Douglas* factor analysis he applied factor 10 to conclude that neither appellant could be rehabilitated because neither had admitted a mistake, and thus accepting responsibility for contributing to the escape. Bryant and Love argue that "Hoey's conclusions are not supported by any evidence and are impermissible as a matter of law."

---

[28] *See Hutchinson,* 710 A.2d at 232.

[29] *See Brown v. Watts*, 993 A.2d at 532.

Citing cases,[30] DOC argues on appeal that Bryant and Love have forfeited their right to challenge Hoey's application of *Douglas* factor 10 because they "did not raise this issue with OEA and OEA did not pass upon it." Some of these cases limit their discussions to forfeiture or waiver of procedural arguments;[31] others appear to impose waiver on merits arguments presented for the first time on appeal.[32] We have also said, however, that "under 'exceptional circumstances,' . . . where 'manifest injustice' would otherwise result," this court will "consider claims that were not presented to the agency,"[33] an exception we have applied with "a measure of flexibility"[34]—and do so today. DOC bases its forfeiture argument on

---

[30] *Sims v. District of Columbia*, 933 A.2d 305, 309 (D.C. 2007); *District of Columbia v. Fremeau*, 869 A.2d 711, 718 (D.C. 2005); *District of Columbia Housing Auth. v. District of Columbia Office of Human Rights*, 881 A.2d 600 (D.C. 2005).

[31] *See Fremeau*, 869 A.2d at 718; *District of Columbia Housing Auth.*, 881 A.2d at 611 ("We have long held that we will not review a procedural claim that was not adequately raised at the agency level.").

[32] *See Sims*, 933 A.2d at 309; *Hutchinson*, 710 A.2d at 232.

[33] *Sims*, 933 A.2d at 309-10 (citations omitted).

[34] *See, e.g., Goodman v. District of Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 n.4 (D.C. 1990) ("We agree with Professor Davis that a reviewing court has discretionary authority to consider issues which have not been raised before the agency. We join the federal courts in holding, however, that this authority should be exercised only in exceptional circumstances to avoid manifest injustice.") (citing *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979); 4 K.C. DAVIS, ADMINISTRATIVE LAW TREATISE § 26.7, at 441-44 (1983)); *Rafferty v. District of Columbia Zoning Comm'n*, 583 A.2d 169, 178 (D.C. 1990) ("In the

(continued . . .)

the fact that Love and Bryant failed to raise the factor 10 issue at the time Judge Lim (OEA) was considering Hoey's decision.

On OEA's remand to DOC after Judge Abrecht's 2010 reversal of Judge Lim's OEA decision in 2009, Director Hoey applied the *Douglas* factors he considered relevant and affirmed the terminations. Bryant and Love then challenged Hoey's final decision by asking OEA (Judge Lim) to review, a second time, whether DOC's "penalty was appropriate under the circumstances."

Judge Lim understood the appeal to encompass a challenge to the specifics of Director Hoey's revised *Douglas* factor analysis. In his opinion, the judge explicitly addressed factor 10, stating in identical language for each appellant Hoey's conclusion that "the potential for employee Bryant's [and Love's] rehabilitation was poor because of Bryant's [and Love's] insistence that he was not at fault for his offense." On appeal to this court, Bryant and Love contend that Judge Lim's attention to *Douglas* factor 10 means that they adequately presented the issue to OEA and, in doing so, preserved it for appeal.

---

(. . . continued)
absence of exceptional circumstances a reviewing court will refuse to consider contentions not presented before the administrative agency at the appropriate time.") (internal citations omitted); *James Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 45 n.4 (D.C. 1989).

The fact that Judge Lim considered factor 10, among other *Douglas* factors, to be a part of the case does not entirely nullify DOC's argument that appellants had failed to target that factor emphatically enough before OEA to preserve it for our consideration. Nonetheless, given the tortured history of this litigation, we are satisfied that we would countenance manifest injustice were we not to consider on this appeal the importance of a factor, unquestionably in the case, that counsel for appellants has clearly presented to this court and DOC has forcefully countered. DOC has had full opportunity to address the *Douglas* factors twice, based on the record of the OEA evidentiary hearing. At this point in the proceeding, therefore, a strictly legal review of the factor 10 issue is required, without new factual findings—a review that this court is in a position to make without further assistance from Judge Lim. DOC's counsel on appeal has had no greater difficulty in defending DOC's factor 10 decision before us (the matter has been fully briefed and argued) than counsel would have if the case were returned instead to OAH for Judge Lim to take another look. Accordingly, we proceed to the merits.

### *Potential for Rehabilitation: The Merits*

Bryant and Love contend that termination of their employments was arbitrary and capricious—indeed, "impermissible as a matter of law"—because

Director Hoey (misapplying *Douglas* factor 10) concluded that both Bryant and Love lacked potential for rehabilitation. That lack of potential was clear, Hoey said, because each had refused to acknowledge his mistake in facilitating Leaks's eligibility for work detail. That reasoning, argue appellants, was an abuse of discretion because it penalized them merely for defending their actions during litigation.

Appellants note that the federal Merit Systems Protection Board has ruled that it is "inappropriate to consider an appellant's denial of misconduct as an aggravating factor in determining the maximum reasonable penalty. Thus, it is also inappropriate . . . to consider an appellant's lack of remorse for the misconduct when that lack of remorse is a consequence of his denial of misconduct."[35] DOC would distinguish *Smith* by arguing that *Smith* concerned an employee who had denied the very actions for which he was punished, whereas Love and Bryant acknowledged at the first OEA hearing that they had taken the actions that led to their terminations, but then defended those actions as correctly taken. Director Hoey thus feared that, given the opportunity, Love and Bryant would act no differently in the future. Hoey then concluded that termination would be appropriate because each appellant's singular misstep was "compounded by [that

---

[35] *Smith v. Dep't of Navy*, 62 M.S.P.R. 616, 621 (M.S.P.B. June 2, 1994).

appellant's] refusal to accept responsibility for his action[.]" Hoey, therefore, re-imposed the terminations largely because Love and Bryant had not displayed the proper level of remorse at the OEA evidentiary hearing.

We are not persuaded by DOC's argument. The only alleged instances in the record of Love's and Bryant's failures to acknowledge their mistakes are their respective explanations of the reasoning that underlay their actions in dealing with Leaks's case file. As explained in *Smith*, the mere defense of one's actions against a charge of employee misconduct cannot legitimately be equated with a "lack of remorse," relied on to reject the "potential for rehabilitation" under *Douglas* factor 10.[36] We therefore cannot accept DOC's justification for terminating employment merely on the ground (as DOC's brief puts it) that appellants' legal defenses "gave no indication they would even accede to DOC's view of those requirements."

DOC has failed to cite any more specific record evidence for Hoey's conclusions that Love's and Bryant's failure to acknowledge their mistakes would likely cause them to continue making negligent interpretations of DOC's security regulations. We therefore must conclude that DOC lacked evidence sufficient to sustain a finding that appellants lacked potential for rehabilitation. DOC's

---

[36] *See Smith*, 62 M.S.P.R. at 621.

decision to terminate their employments was arbitrary, capricious, and not in accordance with the law.[37]

## IV.

For the reasons set forth above, we sustain OEA's findings of negligence, reverse its decision upholding DOC's terminations of Bryant's and Love's employments, and remand the case to OEA for further proceedings consistent with this opinion.

*So ordered.*

---

[37] D.C. Code § 2-510 (a)(3)(A) (2012 Repl.).