*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 21-CV-0275 & 21-CV-0276

MARY OATES WALKER, APPELLANT,

V.

D.C. OFFICE OF EMPLOYEE APPEALS, *et al.*, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(2019-CA-002406-P(MPA), 2019-CA-003093-P(MPA))

(Hon. Jose M. Lopez, Trial Judge)

(Argued October 19, 2022                    Decided February 29, 2024)

*Daniel J. McCartin,* with whom *Anthony M. Conti* was on the brief, for appellant.

*Lasheka Brown* filed a Statement in Lieu of Brief for the D.C. Office of Employee Appeals.

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Karl A. Racine,* Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for the Executive Office of the Mayor.

Before EASTERLY and MCLEESE, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

EASTERLY, *Associate Judge*: Mary Oates Walker challenges the decision by the Office of Employee Appeals ("OEA") upholding the Executive Office of the Mayor's ("EOM") decision to terminate her employment as Chief Administrative Law Judge for the Office of Administrative Hearings. Specifically she asserts that OEA's decision was not supported by substantial evidence; OEA erred in rejecting her claims that she was terminated without due process and in violation of D.C. Code § 2-1831.04(b)(7) and 6-B D.C.M.R. § 907.3; and OEA erred in rejecting her argument that the Mayor was obligated to consider the *Douglas* factors, *see infra* note 7, in deciding whether termination of her employment was the appropriate response to her misconduct.

The OEA's decision was affirmed by the Superior Court, but we "review[] agency decisions on appeal from the Superior Court the same way we review administrative appeals that come to us directly." *Sium v. Off. of State Superintendent of Educ.*, 218 A.3d 228, 232 (D.C. 2019). "Thus, . . . confining ourselves strictly to the administrative record, we review the OEA['s] . . . decision, not the decision of

---

[*] Judge Glickman was an Associate Judge at the time of argument. His status changed to Senior Judge on December 21, 2022.

the Superior Court." *Id.* (internal quotation marks omitted). We will affirm the OEA's decision as long as it is "supported by substantial evidence in the record and otherwise in accordance with law." *Love v. D.C. Off. of Emp. Appeals*, 90 A.3d 412, 421 (D.C. 2014) (internal quotation marks omitted). Applying these standards, we affirm.

## I. Facts and Procedural History

Ms. Walker was appointed by Mayor Adrian Fenty in 2010 as Chief Administrative Law Judge for the Office of Administrative Hearings ("OAH"). In 2012, OAH came under public scrutiny in the media. Concerns were raised about Ms. Walker's leadership at OAH, as well as about the fact that she had hired her business partner and friend, Kiyo Oden,[1] to serve as OAH's general counsel in 2010, and recommended the company TPM, owned by Lincoln Tyson, Ms. Oden's then-fiancé, to assist the Department of General Services ("DGS") with the relocation of OAH's offices in 2011. The District's Office of the Inspector General ("OIG") and a private law firm retained by OAH launched investigations, as did the

---

[1] Ms. Oden married in 2011 and became Kiyo Tyson, but we use her maiden name in this memorandum opinion for consistency with the contemporaneous record materials.

D.C. Board of Ethics and Government Accountability ("BEGA"). On Feb. 6, 2014, BEGA issued a Notice of Violation to Ms. Walker, charging her with nineteen violations of specific D.C. ethics statutes and regulations[2] in relation to Ms. Walker's co-ownership of a business licensed in D.C. and Maryland, MKM Ventures, LLC, with Ms. Oden; her preferential treatment of Mr. Tyson and failure to disclose his relationship to Ms. Oden; her related misrepresentations to BEGA investigators; and her leadership at OAH.

The next day, Mayor Vincent Gray placed Ms. Walker on administrative leave with pay and issued an Advance Written Notice of Intent to Remove. The Advance Notice identified five "findings of good cause": the first incorporated by reference the entirety of the BEGA Notice of Violation and the statutes and regulations BEGA

---

[2] D.C. Code §§ 1-1162.23(a) (conflicts of interest), 22-722(a)(6) (prohibiting obstructing or impeding "the due administration of justice in any official proceeding"); District Personnel Manual ("DPM") §§ 1800.3 (private business conflict), 1803.1(a)(1) (appearance of using public office for private gain); 1803.1(a)(2) (giving preferential treatment to anyone), 1803.10 (interfering with or obstructing an investigation by a district agency), 1803.11 (harassment or retaliation against employees acting in good faith), and 1804.1(i) (engaging in other interest in violation of district law) (2006). (BEGA miscited this last DPM regulation as DPM § 1803.1(i), but it was clear that BEGA meant to refer to § 1804.1(i), given that it reproduced the text of that regulation.)

cited; the second identified violations of Chapter V(D) & (P) [3] of the Code of Ethics for ALJs based on the same constellation of facts described in the BEGA Notice of Violation; and the last three identified grounds for removal notwithstanding the outcome of BEGA proceedings in relation to Ms. Walker's failure to disclose her relationship with Ms. Oden to OIG investigators, her misrepresentation under oath to BEGA that she had not suggested TPM be hired to assist with OAH's move, and her inability to resolve conflict at OAH. Ms. Walker sent the Mayor a twenty-page letter in response on Feb. 20, 2014, responding to these findings and denying any wrongdoing.

On May 19, 2014, while the BEGA investigation continued, Mayor Gray issued a Final Notice terminating Ms. Walker. At the outset of the letter, the Mayor stated that he had considered her response, but based on "the entire record available to me" had found against her on all five findings listed in the Advance Notice. The Mayor then made certain findings of fact and set forth his "Determination of Good Cause for Removal." In the good cause discussion, the Mayor seemingly repackaged the five bases for termination for good cause as nine specific violations of ethics law,

---

[3] The Mayor miscited the relevant code chapter as Chapter IV, but it was clear that the Mayor meant to refer to Chapter V(D) & (P) given that he reproduced the text of those two rules and given that Chapter IV(C) and Chapter IV(P) do not exist.

regulations, or codes, almost all of which had been cited in the BEGA Notice of Violation and the Advance Written Notice,[4] all relating to the same facts alleged in the BEGA Notice of Violation and the Advance Written Notice.

Ms. Walker appealed her termination to the OEA. Meanwhile, in 2014 she entered into a negotiated disposition with BEGA in which she admitted she had violated D.C. Code § 1-1162.23(a), and DPM §§ 1800.3, 1803.1(a)(2) by virtue of "maintaining a private business and financial relationship with [Ms. Oden]," and failing to disclose Ms. Oden's relationship with Mr. Tyson to DGS when it hired Mr. Tyson's company to assist with OAH's office move. Ms. Walker agreed to pay a fine of $20,000.

In 2017, OEA held an evidentiary hearing at which more than twenty-five

---

[4] *See supra* note 2. The two additions were D.C. Code § 1-618.02 (conflict of interest) and DPM § 1803.1(f). Regarding the latter, we assume the EOM meant to cite to DPM § 1803.1(a)(6) (affecting adversely the confidence of the public in the integrity of the government), given that § 1803.1(f) does not exist.

In its Final Notice, the EOM also incorrectly cited DPM § 1803.1(a)(a) instead of DPM § 1803.1(a)(1) (using public office for private gain), which had been included both in the BEGA Notice and the Advance Written Notice, but it was clear that the Mayor meant to cite § 1803.1(a)(1) given that the Mayor reproduced its text in his letter.

witnesses, including Ms. Walker, Ms. Oden, Mayor Gray, and Mayor Gray's General Counsel at the time of Ms. Walker's termination, Brian Flowers, testified.[5] On March 26, 2019, the OEA issued its decision upholding Ms. Walker's termination, focusing on "Mayor Gray's five charges." Although the OEA concluded that good cause did not exist to terminate Ms. Walker based on her inability to resolve conflict within OAH, it ruled that she had (1) violated D.C. Code § 1-1162.23 by failing to divest herself of her interest in MKM Ventures; (2) violated Chapter V(D) and (P) of the OAH Code of Ethics for ALJs by maintaining her engagement in an outside business, MKM Ventures; (3) failed to disclose information to BEGA investigators regarding Ms. Oden's involvement with MKM Ventures; and (4) made misrepresentations under oath to BEGA investigators when she denied she recommended TPM to DGS officials. The OEA rejected Ms. Walker's due process claims that she was entitled to a pre-termination hearing and that Mayor Gray had failed to personally consider her response to his Advance Notice of termination. The OEA also rejected Ms. Walker's argument that the Mayor was required to justify her removal under a *Douglas*[6] factor analysis. On

---

[5] The OEA initially issued a decision without holding a hearing but the Superior Court reversed, ruling that Ms. Walker was due a post-termination hearing as a matter of due process, and remanded.

[6] *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981) (Merit System Review Board decision that it possesses authority to mitigate agency imposed

consideration of Ms. Walker's petition for review of the OEA's decision, the Superior Court affirmed.

## II. Substantial Evidence Claims

As noted above, we review the OEA's factual findings only for "substantial evidence." *Brown v. Watts*, 993 A.2d 529, 532 (D.C. 2010). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If the administrative findings are supported by substantial evidence, we must accept them even if there is substantial evidence in the record to support contrary findings." *Hutchinson v. D.C. Off. of Emp. Appeals*, 710 A.2d 227, 230-31 (D.C. 1998) (internal citations and quotation marks omitted).

The OEA upheld four good cause findings from the EOM's Final Notice for Ms. Walker's removal from office. But because the Final Notice stated that each listed finding independently constituted good cause for Ms. Walker's removal, and Ms. Walker has not challenged the validity of that statement, we see no need to

penalties that are excessive, disproportionate, or arbitrary, capricious, or unreasonable and identifying twelve factors that are generally recognized as relevant to that analysis).

address all four. Instead, in the interest of economy, we address only one: the finding that Ms. Walker violated the ALJ Code of Ethics. *Cf. Jones v. D.C. Unemp. Comp. Bd.*, 395 A.2d 392, 395-96 (D.C. 1978) (explaining that the agency could have upheld discharge on only one ground if it was clear the employer intended each ground to be an independent basis).

The Code of Ethics for Administrative Law Judges states in pertinent part that "[a]n [ALJ] shall refrain from financial and business dealings that tend to reflect adversely on impartiality, interfere with the proper performance of judicial duties, [or] exploit the [ALJ's] official position" and "shall not serve as an officer, director, manager, general partner, advisor, independent contractor[,] or employee of any business entity." D.C. Off. of Admin. Hearings, Code of Ethics for OAH Administrative Law Judges Chapter V(D) & (P) [hereinafter ALJ Code of Ethics] (adopted by the Chief ALJ pursuant to Section 8(a)(9) of the OAH Establishment Act of 2001, D.C. Law 14-76, codified at D.C. Official Code § 2-1831.05(a)(9)). The OEA, like the Mayor before it, found that Ms. Walker had violated this rule because it was undisputed that she had "held a one-third interest as a member of MKM Ventures MD and DC while employed as OAH's [Chief] ALJ." The OEA further found that Ms. Walker's "involvement with the various MKM entities should . . . have required her to legally divest herself from the business entities upon

her appointment to the position of [Chief] ALJ" and "should have precluded her from offering the OAH General Counsel position to [Ms.] Oden."

As the EOM highlights, Ms. Walker did not make any argument in her briefs to this court (or in her filings in the Superior Court) that the OEA's finding that she violated these Ethics Code provisions lacked a substantial evidence foundation.[7] Ms. Walker attempts to contest her forfeiture of this argument in her reply brief, asserting that she has "not conceded any good cause for her removal." But she points only to her challenge to the good cause finding under D.C. Code § 1-1162.23, which does not preserve a challenge to the application of Chapter V(D) & (P) of the Code of Ethics for OAH Administrative Law Judges, and her discussion of her asserted disclosure of her involvement in MKM Ventures to various individuals and entities, which is unhelpful given that the Ethics Code provisions impose flat bans on certain conduct and do not recognize exceptions to those bans so long as the conduct is disclosed. *See* ALJ Code of Ethics, Chapter V(D) & (P).

Regardless, the OEA's findings here were supported by substantial evidence

---

[7] Before the OEA Ms. Walker argued that she should not be found in violation of these Ethics Code provisions because the MKM "entities had been essentially abandoned and were losing money," but the OEA rejected these arguments.

in the record, including: (1) various organizational documents, bank statements, property conveyances, and emails entered into evidence during the OEA hearings, confirming that MKM Ventures was founded in 2006 and that Ms. Walker and Ms. Oden jointly participated in it through their time as government employees; (2) testimony from the OEA hearings in which Ms. Walker and Ms. Oden as well as the third MKM manager confirmed their participation in MKM Ventures during their government employment; and (3) findings of fact in the BEGA Negotiated Disposition[8] to which Ms. Walker agreed, stating that Ms. Walker and Ms. Oden and a third-party started MKM Ventures in 2006 and "maintained a private business and financial relationship that continued during their employment" in D.C. government, including monetary contributions at least through 2012.

### III.   Procedural Claims

It is undisputed that Ms. Walker had a property interest in her employment as

---

[8] Even though the Negotiated Disposition postdated both the EOM's Advance Notice and its Final Notice of Removal, the OEA explained that the Negotiated Disposition was "nevertheless [] relevant and material in this matter as . . . clear proof of [Ms. Walker's] unethical misbehavior, particularly because several of the reasons for termination set forth in the Final Notice were admitted to by [Ms. Walker] in the [negotiated disposition]." Ms. Walker did not object to the OEA's consideration of the Negotiated Disposition although she now seeks to minimize its significance, *see infra* note 18.

Chief ALJ of OAH. *See* D.C. Code § 2-1831.04(b)(7) (2014) (restricting termination before the end of the Chief ALJ's term except for "good cause"). As a result, she was constitutionally entitled to "due process of law"—notice and the opportunity to be heard—before permanent deprivation of that interest. *See* U.S. Const. amend. V; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." (internal quotation marks omitted)). We review her constitutional claims de novo. *See Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 226 (D.C. 2020).

We do not understand Ms. Walker to make a due process-notice challenge to her removal.[9] Rather, she asserts she should have been granted a full evidentiary

---

[9] Ms. Walker does make a regulatory argument that she was "never provided a meaningful pre-termination opportunity to respond to the charges against her because the grounds for termination in the Mayor's advance notice of intent to remove differed from the grounds for termination in the Mayor's final termination letter," as required by 6-B D.C.M.R. § 907.3, highlighting that only five findings of good cause were listed in the Advance Notice while nine were listed in the Final Notice. Ms. Walker did not make this argument before the OEA and as discussed above, we see no material variation between the two notices. In any event Ms. Walker has never argued that she did not have specific notice that the Mayor was considering her removal due to her violation of Chapter V(D) and (P) of the Ethics Code for OAH Administrative Law Judges.

hearing pre-termination, and second, that the Mayor violated the maxim of "[t]he one who decides must hear," *Feldman v. Bd. of Pharmacy*, 160 A.2d 100, 102 (D.C. 1960) (quoting *Morgan v. United States*, 298 U.S. 468, 481 (1936)), by not personally considering her written response.  Like the OEA, we disagree.

As for Ms. Walker's first argument, the OEA rightly concluded that Ms. Walker had "not present[ed] any credible binding case or statu[t]e that mandates that her [evidentiary] hearing occur before her removal was effectuated." Ms. Walker's reliance on *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), is misplaced*.  Loudermill* analyzed the process due to a public employee who, by statute, could only be terminated for cause and had a right to appeal his decision and receive a "full post-termination hearing."  470 U.S. at 535, 546.  After conducting the requisite "balancing of the competing interests at stake" under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the court concluded that a full evidentiary hearing, pre-termination, was not needed.  *Loudermill*, 470 U.S. at 542, 545 (holding that a "'hearing,' though necessary, need not be elaborate").  Instead, at that juncture, the employee need only be accorded "an opportunity to present [their] side of the story," "either in person or in writing."  *Id*. at 546.

Ms. Walker received an opportunity "to present [her] side of the story" before

she was removed from office. *Id.* In his February 7, 2014, Advance Notice, the Mayor invited her to "respond in writing." She did so, on February 20, 2014, submitting a twenty-page response with 186 pages of exhibits. (Although she asked the Mayor to postpone his decision until BEGA and other proceedings had concluded, she did not request an evidentiary hearing at that time.[10]) On such analogous facts to *Loudermill*, Ms. Walker received all the "process [she was] due." *Id.* at 541.

We are unpersuaded by Ms. Walker's citation to *Goldberg v. Kelly*, 397 U.S. 254 (1970), a case decided pre-*Loudermill*, entitling public assistance recipients to an evidentiary hearing before those benefits are terminated. Ms. Walker asserts *Goldberg* supports her claim that when "credibility and veracity are at issue . . . written submissions are a wholly unsatisfactory basis for decision." *Id.* at 269. While termination of employment undeniably has a profound effect on someone's life, the Supreme Court's decision in *Goldberg* was focused on the distinct and dire situation that someone reliant on public benefits, by definition low-income and often already without employment, would face if those benefits were

---

[10] Ms. Walker made her request for an evidentiary hearing three months later, on May 12, 2014, after she learned that the Mayor had set a May 14, 2014, deadline to proceed with his removal decision.

unjustly terminated, and the Court specifically distinguished this scenario from that of "the discharged government employee," *Goldberg*, 397 U.S. at 264, which it subsequently addressed in *Loudermill*. *See* 470 U.S. at 545 (noting that *Goldberg* was the only case in which "the Court [had] required a full adversarial evidentiary hearing prior to adverse governmental action" and explaining that "that case presented significantly different considerations than are present in the context of public employment").

We are likewise unpersuaded by Ms. Walker's argument that her liberty interest in clearing her name gave her a due process right to a pre-termination evidentiary hearing under *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Ms. Walker fails to explain how *Board of Regents*, which held an untenured professor did not have a due process right to a pre-termination hearing, *id.* at 578, supports her argument. Nor does she reconcile her argument with the Supreme Court's express consideration of this concern in *Loudermill*, when it analyzed the process due to a government employee in Ms. Walker's circumstances. The Court acknowledged that a terminated employee seeking new employment "is likely to be burdened by the questionable circumstances under which [an employee] left [their] previous job," 470 U.S. at 543; nonetheless the Court held in *Loudermill* that a pre-termination evidentiary hearing was not required as a matter of due process. *Id.* at

547-48.

Alternatively, Ms. Walker argues that she was deprived of a *meaningful* opportunity to be heard prior to her removal because the Mayor testified that he did not personally review her written response to the Advance Notice, nor the evidence supporting it. Ms. Walker argues that the Mayor violated the principle that "[t]he one who decides must hear," *Feldman*, 160 A.2d at 102 (quoting *Morgan*, 298 U.S. at 468). She further relies on D.C. Code § 2-1831.04(b)(7) (2014), which specifies that the Chief ALJ of OAH can be terminated only upon a "written finding of the *Mayor*." *Id.* (emphasis added).

We affirm the OEA's conclusion that the Mayor was empowered to reach decisions using his staff and without delving into the "minutiae of work necessary to effectively carry out every policy and procedure necessary for good governance."[11] Although the Mayor was statutorily obligated to make the final decision to remove Ms. Walker from office, *see id.*, he was also statutorily authorized to make broad delegations of power in coming to that decision, *see* D.C. Code § 1-204.22(6) (2014). And it is wholly within the bounds of due process for a

---

[11] The OEA came to this conclusion in assessing Ms. Walker's due process arguments and did not explicitly reference D.C. Code § 2-1831.04(b)(7) in this context. But we conclude the same rationale governs.

statutorily obligated decision maker to delegate the review and interpretation of evidence to staff and rely on those staff members to inform their final decision. *See Braniff Airways, Inc. v. Civ. Aeronautics Bd.*, 379 F.2d 453, 461 (D.C. Cir. 1967)[12] ("It is well settled that . . . an administrative officer may rely on subordinates to sift and analyze the record and prepare summaries and confidential recommendations, and the officer may base his decision on these reports without reading the full transcript."); *Feldman*, 160 A.2d at 102 (noting that it does not violate due process for a "hearing officer . . . [to] submit[] a report to a superior board or agency for its decision"); *see also Morgan*, 298 U.S. at 481 (explaining that "[e]vidence may be taken . . . [and] sifted and analyzed by competent subordinates"); *S. Garment Mfrs. Ass'n v. Fleming*, 122 F.2d 622, 627 (D.C. Cir. 1941) ("Realism negatives the idea that a subordinate is to exercise no intelligence . . . .").

Thus it is immaterial that the Mayor did not personally review Ms. Walker's written submission or her exhibits, as his role in "consider[ing] and apprais[ing]" the evidence, *Feldman* 160 A.2d at 102, did not require such a personal review. Instead it was sufficient that (1) the Mayor's general counsel and other staff reviewed these

---

[12] Decisions of the U.S. Court of Appeals for the D.C. Circuit prior to February 1, 1971, are binding on this court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

materials, conducted additional investigation, and prepared for his review and approval of a Final Notice[13] that referenced Ms. Walker's response,[14] and that (2) the Mayor, contrary to the representations made by Ms. Walker's counsel at oral argument, in fact approved and signed the letter.[15]

## IV.   Consideration of the *Douglas* Factors in Determining Whether Removal of Ms. Walker from Office Was Justified

Lastly, Ms. Walker argues that the Mayor's decision to remove her was arbitrary and capricious because he concededly did not consider the *Douglas* factors.

---

[13] Ms. Walker highlights the fact that Mr. Flowers admitted that he did not draft good cause findings seven through nine in the Final Notice (when the Mayor repackaged the five bases for termination for good cause as nine specific violations of ethics law, regulations, or codes).  But given that we have concluded that we only need to look to the Mayor's determination that good cause existed to remove Ms. Walker based on her violation of the Code of Ethics for ALJs—number five in this list of nine—this admission cannot give rise to reversible error.

[14] Given our assessment that the Final Notice and the Advance Notice were not materially different in detailing the Mayor's good cause findings, *see supra* note 9, we agree with Ms. Walker that the OEA was wrong to conclude that Ms. Walker had actually persuaded the Mayor not to rely on certain findings listed in the Advance Notice.

[15] *Hodges v. U.S. Postal Serv.*, 118 M.S.P.R. 591 (M.S.P.B. 2012), which is not binding authority on this court, is not to the contrary, as Ms. Walker claims. *See id.* 593-94 (holding that due process was violated when the only official involved in the decision did not consider the employee's response).

*See supra* note 6. The OEA concluded that these factors do not apply to Ms. Walker because her position as the Chief ALJ of OAH is designated "excepted service," *see* D.C. Code § 2-1831.04(9) (designating the Chief ALJ of OAH as excepted service), and under the D.C.M.R., the *Douglas* factors do not apply to individuals in excepted service positions, 6B D.C.M.R. § 1600.2(f) (excluding excepted service positions from the career and educational service regulations); *id.* § 1606.2 (requiring *Douglas* factor consideration only for the career and education service). We assume without deciding that the *Douglas* factors do apply to Ms. Walker and affirm the OEA's ruling uphold the Mayor's decision to remove Ms. Walker as the Chief ALJ of OAH.

In *Stokes v. District of Columbia*, 502 A.2d 1006 (D.C. 1985), this court affirmed a Superior Court decision ruling that the OEA had overstepped its bounds in reinstating a career service employee to his job. 502 A.2d at 1007. Explaining that the OEA's job was "like that of its federal counterpart, the Merit Systems Protection Board, . . . simply to ensure that managerial discretion has been legitimately invoked and properly exercised," "not to substitute its judgment for that of the agency," this court endorsed the OEA's decision in an earlier case to be "guided" in its review of agency decision-making by the *Douglas* factors. *Id*. at 1010-11 (internal quotation marks omitted). As the cases cited by Ms. Walker reflect, the *Douglas* factor analysis is a tool for the OEA and this court to ensure an

agency's decision to sanction or terminate an employee is well-grounded.[16] *See, e.g., Love*, 90 A.3d at 417 n.10 (explaining that in *Stokes*, this court "essentially adopted *Douglas* to aid our review of employment terminations, reviewed by [the] OEA"); *D.C. Metro. Police Dep't v. D.C. Off. of Emp. Appeals*, 88 A.3d 724, 730 n.3 (D.C. 2014) ("There is no requirement that an agency articulate its *Douglas* analysis *before* terminating an employee.") (emphasis in original). Accordingly, we reject Ms. Walker's argument that the Mayor was required to engage in an analysis of the *Douglas* factors. At most, the Mayor was simply required to reach a decision that could survive a *Douglas* factor review by the OEA.

Furthermore, although the OEA determined (correctly) that the Mayor "was not required to perform an explicit *Douglas* Factor analysis" it then determined that

> had a *Douglas* factor analysis been performed[,] it is likely that *Douglas* Factors 1 [the nature and seriousness of the offense and its relation to the employee's duties, including whether the offense was intentional or technical or inadvertent, or was committed intentionally or maliciously for gain, or was frequently repeated], 2 [the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position], 5 [the effect of the offense on the employee's ability to perform at a satisfactory level and its effect on supervisors' confidence in the employee's ability

---

[16] We have never held that *Douglas* applies to members of the excepted service, and all the cases Ms. Walker cites in her briefs to this court involve career service employees.

to perform assigned duties], 8 [the notoriety of the offence or its impact on the reputation of the agency] and 9 [the clarify with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question] would have been aggravating factors in her removal analysis.

Ms. Walker has not challenged the OEA's assessment of these *Douglas* factors (or identified factors that the OEA should have but failed to consider).[17] Even if she had, we would see no basis to reverse on this record.

As explained above, the Mayor determined there was good cause to remove Ms. Walker from her office as the chief jurist for the Office of Administrative Hearings, because she had violated the Code of Ethics for the Administrative Law Judges. Subsequent to that determination Ms. Walker entered into a negotiated disposition with BEGA, in which she admitted to multiple charges of ethical wrongdoing. Specifically she admitted that she had violated the District Code of Conduct, D.C. Code § 1-1162.23(a), regarding conflicts of interest, and had violated provisions of the District Personnel Manual, DPM §§ 1800.3, 1803.1(a)(2), based on (1) her "private business and financial relationship" with Ms. Oden that existed at the time Ms. Walker hired Ms. Oden and continued thereafter while she

---

[17] Even as to the Mayor, Ms. Walker has never explained how an analysis of the *Douglas* factors would have led to a different outcome; she only posits that his failure to consider them was in itself arbitrary and capricious.

"supervised and was a superior to" Ms. Oden, and (2) her failure to disclose to DGS her "social relationship" with Lincoln Tyson or her knowledge of his relationship with Ms. Oden. Ms. Walker agreed to a $20,000 fine in return for BEGA dismissing the remaining ethics charges against her, and expressly conceded that the Negotiated Discipline is "not just an admission but constitutes various factual admissions by her" that could be used in any future efforts to enforce the agreement.[18] Based on these facts, we agree that the *Douglas* factors the OEA identified supported Ms. Walker's removal.

*              *              *

For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered.*

---

[18] Based on this language, we reject Ms. Walker's argument that the Negotiated Disposition cannot be construed as an admission and was only a "settlement agreement that [she] entered into to resolve the baseless allegations levied against her by BEGA."